(No. 6123.   February 19, 1935.)

GEM  STATE  SALES  COMPANY,  a  Corporation,  Respondent,  v.  RUDIN  BROTHERS,  INC.,  Appellant.

[41 Pac. (2d) 615.]

Hawley & Worthwine, for Appellant.

George Donart and Norris & Kenward, for Respondent.

GIVENS, C. J.—Respondent sued appellant for an alleged balance of $3,139.89 for purchasing, packing and delivering prunes, recovering a verdict for $835.20 on the claimed contract, entered into by appellant through Cornfield, its agent and secretary-treasurer, and respondent through Fawcett, its president and manager, that it was to buy approximately 45 carloads of prunes (50 was the full amount) in Oregon and thereafter sort, grade, pack, load and ship them on cars to appellant or at the direction of appellant, for the cost of the prunes, $15 per ton, plus all expenses and $20 a car brokerage. Appellant admitted such to be the contract but alleged a complete and final settlement and payment in full of all money due.

Appellant's sole ground for reversal is that the evidence in support of respondent, viewed in the light of all the circumstances, is so inconsistent and defective and so improbable and inherently false as to amount to an insufficiency of evidence to support the verdict, hence justifying and demanding a reversal as a matter of law; and that the force and effect of respondent's Exhibit 7 as a receipt culminating the alleged final settlement has not been overcome by incumbent clear and satisfactory proof.

The contract, whatever it was, was oral, progressively changing consequent to conferences between Fawcett and Cornfield at Payette and the Milton-Freewater prune section in Oregon, the actual scene of operations.

Prunes were purchased by the respondent and packed by, or under its supervision, and delivered on the cars to appellant. Appellant from time to time advanced certain moneys and finally, on September 13th–14th, 45 cars of

prunes having been delivered, a conference or negotiation took place between Fawcett and Cornfield at Walla Walla, Washington, where Fawcett prepared and delivered to Cornfield, respondent's Exhibit 7, entitled "Cars Shipped for Rudin Brothers," giving the date of shipment, car number and value, at 46½ cents per basket or 25.3 cents per suitcase, according to the car content, with respective "Dr." and "Credit" columns identical in amount for 44 cars, and one "Dr." designated car, $450.20, with no corresponding item under the "Credit" column; and the following items, "Additional cost of packing charges, $865.00," which appellant contends was half of the amount claimed by respondent as its loss on the entire transaction, which loss Cornfield stated he was willing to share because appellant had made money on its end of the deal.

There were two other items, which with a check for $835.20 under the "Credit" column balanced the "Dr." column, containing in addition to the cars, the $865 above noted, with this statement at the end: "Received settlement in full of cars. Gem State Sales Company, by E. C. Fawcett, President."

Appellant strenuously argues this receipt can only mean full settlement, and that the matter was entirely closed at the conference in Walla Walla. Respondent, on the other hand, contends this document merely relieved respondent from furnishing the full number of 50 cars, and that final financial settlement awaited further action to be taken at Payette. The real issue, therefore, from appellant's standpoint in connection with its claim of insufficiency of the evidence to support the verdict and the erroneous refusal by the court of a nonsuit or instructed verdict, hinges not on what the contract was, but whether there was a final and complete settlement at Walla Walla, and in that connection, if there is evidence in the record sufficient to reasonably justify the jury's reliance thereon in rendering the verdict it did, appellant's point is squarely met, and under the well-known rule which it concedes, no matter however

much the conflict is, the verdict may not be disturbed. In other words, it is not how plausible an interpretation may be placed on the evidence in favor of appellant but we must consider whether everything, taken in its most favorable light in favor of respondent, is insufficient.

Appellant's first charge of unreasonableness is that Fawcett contended he was entrusted with the packing operations without any definite agreement, but that from his packing operations he was going to try to determine the package basis cost and next sets up as an inconsistency or weakness in respondent's position that it is illogical to assume a 46½ cents basis would coexist with an expense and cost agreement as pleaded by respondent. Yet Cornfield himself stated they started out on the theory of 6 cents a basket for labor and other incidentals, and that he would pay 8 cents, splitting the profit between 6 and 8 cents.

If it was illogical for respondent to start on a basis of 46½ cents, and still continue to rely on actual costs as the basis for settlement, it would seem Cornfield's position was no more definite or logical when he started from a basis of 6 and 8 cents. Cornfield concededly kept no account of the costs of packing, but relied on respondent and though he testified he was denied access to Fawcett's books, he conferred frequently with Fawcett as to what the operations were costing, and even at the conference in September when respondent's Exhibit 7 was prepared and delivered, Cornfield again went over the figures as to the cost with respect to whether or not he would, according to his contention, settle on a basis of 46½ cents and 25.3 cents, and the jury may have legitimately construed all this in line with respondent's contention. Cornfield made advances from time to time and if these were only on the basis of 46½ cents and 25.3 cents, checking on the amount of prunes shipped out, as he could and did, he would always know if these advances were in excess of the price on that basis. If, however, he depended on the actual cost of operation, which would be in line with respondent's contention, he would

of course have to keep track of the cost, as he did, to see that he did not over-advance. Whether or not the deductions above noted were the most reasonable or probable or the ones that actuated the jury, we do not know or say, nor need we, we merely call attention to their juristic availability.

Cornfield admits he paid more than initially obligated to, merely for the purpose of decreasing what respondent claimed and attempted to show at the beginning of the conference was its loss of over $3,000. It was for the jury to say whether Cornfield was thus gratuitously generous or under compulsion of the contract, the final accounting to be at Payette, as inferable at least in part, from portions of the testimony of Miss Gorton adverted to *post*. Fawcett testified he had all his records at the trial, was cross-examined at length on them, and respondent's Exhibit Q, which he claimed was a statement of his costs, showing a balance due of $3,807.98, was admitted and its force and weight was for the jury.

Fawcett testified he wanted to go to Payette for the final settlement. Cornfield testified the matter was finally arranged at Walla Walla and no further negotiations contemplated. Miss Gorton, the only other party who was apparently present all during the conference, in a way contradicts both of them, as will appear from the following:

"Q. What did Mr. Fawcett say to Mr. Cornfield when they finally settled the whole matter.

"A. It was terribly late at night—or morning. Mr. Fawcett said 'Let's get the matter cleaned up tonight?' Mr. Cornfield wanted to take time. Mr. Fawcett said 'Let's get the matter straightened up so I can see the Growers?' He said 'If you will give me this money we will call the deal over and I will never mention this deal again if you will agree to this.' . . . .

"Q. When did Mr. Cornfield say he desired to wait and make a settlement later than that night.

"A. Mr. Fawcett told him he had a loss of $4,600.00, and Mr. Cornfield said he did not believe it was possible. He wanted to wait and go over the figures.

"Q. And where did he say he wanted to go over them.

"A. He said he wanted to go to Payette as soon as he could, but it was very late then and he wanted to check them over—possibly the next day.

"Q. Then they did have some conversation over checking at Payette and arriving at the amount due.

"A. Mr. Cornfield said he wanted to go to Payette on business the next day, and I presume he wanted to have the time.

"Q. There was some talk about going over the figures at Payette.

"A. All that was said was Mr. Cornfield said 'I want to check over these figures. I want to go over them.' and that 'I do not think they are final as I do not believe they are correct. I want to leave as soon as possible. I want to go tomorrow.' I do not know anything more definite about that.

"Q. Did he want to go to Payette tomorrow, or leave Payette.

"A. To go to Payette.

"Q. Did he go the next day.

"A. Yes, sir. . . . .

"Q. Would you swear positively that no statement was made there about coming to Payette and at Payette figuring out the exact amount of the costs.

"A. I did not just understand the question.

"Q. Would you swear positively that no statement was there made about waiting or coming to Payette and when they arrived at Payette the exact amount of the cost would be figured and determined there.

"A. Well, I would not swear positively either way. No direct statement was made, I do not think.

"Q. You would not swear positively no such statement was made there.

"A. I knew Mr. Cornfield wanted to check over the figures and wanted to leave for Payette as he had business there. Mr. Fawcett said 'I want my money.' Mr. Cornfield said 'I want to check over these figures.' . . . .

"Q. Then, if I understand you correctly, Mr. Cornfield agreed he would pay one half of the $1,700 loss and, in addition, pay $480.00.

"A. They agreed to that, and there was other items taken into consideration. I do not remember just how that was." and makes this final statement as to herself:

"A. I do not think so. I do not remember it. There was a lot of discussion and a great deal said.

"Q. In other words, a great deal of discussion and you have probably forgotten some of it.

"A. Probably, yes."

Appellant also urges that, because Mrs. Bowman, secretary and co-owner of respondent, present at the conference, was in the courtroom but never called by respondent for a witness, the rule that when a party has it within his power to produce witnesses presumably favorably disposed toward him who can explain a transaction or answer a controverted question, his failure so to do unless satisfactorily explained justifies an inference that the evidence if produced would be unfavorable to his side of the controversy (*Sullivan v. Idaho Wholesale Co.*, 43 Ida. 149, 249 Pac. 895; *Garrett v. Neitzel*, 48 Ida. 727, at p. 733, 285 Pac. 472), applies and requires a reversal.

Conceding the applicability of the rule, though not admitting it because it was not shown that Mrs. Bowman was present all of the time, or that she was present when the material parts of the conference were carried on, full indulgence in the presumption would only add to the conflict in the evidence and the inferences, but would not itself compel a reversal.

Miss Gorton states she was working for Cornfield; this was a circumstance for the jury to weigh in construing her testimony in favor of or against appellant.

The positive and direct testimony on the part of respondent that the contract was according to its interpretation, and the inferences above suggested, and the credence to be placed upon the testimony of the particular witnesses and resolving the conflicts were for the jury. (64 C. J. 303–308.)

The check given at the time respondent's Exhibit 7 was given bore no notation on it that it was in payment of settlement in full. Conceding that it did not have to so state, it was at least a circumstance in support of respondent's contention that it was not in final settlement and that if it had been, Cornfield would have stated so on the check. Likewise, whether or not Cornfield would have been willing to share in respondent's claimed loss when under his interpretation of the contract and the actual costs of operation he did not have to do so, as bearing upon whether or not there was in fact a final settlement in Walla Walla, together with at least parts of Miss Gorton's testimony that Cornfield wanted to go to Payette for the final settlement, must all be taken into consideration and though some of the evidence may have been of a negative character, a reversal is not thereby demanded. (*State v. American Surety Co.*, 26 Ida. 652, 145 Pac. 1097, Ann. Cas. 1916E, 206.)

The testimony with regard to the books and records that were introduced and the showing as to what it actually cost merely present a basis for different conclusions, and would support respondent to this extent at least, that there were figures which on their face showed that the actual cost was more than the amounts set out in respondent's Exhibit 7 and that one grower was unpaid. It was for the jury to determine what credence they would give the testimony of the different witnesses, and how they would reconcile the inconsistencies seeming and real, and the conflicting interpretations to be placed upon the documentary evidence, supplemented by the oral testimony. Appellant cites many cases from this court holding the evidence therein

considered insufficient, but each case must be determined as to this point on its own issues and facts, and the most that can be said here is that there was a conflict not only in the direct evidence but in the inferences, probabilities and conclusions, which situation, however, does not justify this court in reversing the judgment. (*Gagnon v. Molden*, 15 Ida. 727, 99 Pac. 965; *Staab v. Rocky Mt. Bell Tel. Co.*, 23 Ida. 314, 129 Pac. 1078; *Quirk v. Sunderlin*, 23 Ida. 368, 130 Pac. 374; *Wheeler v. Gilmore etc. R. R. Co., Ltd.*, 23 Ida. 479, 130 Pac. 801; *Meeker v. Trappett*, 24 Ida. 198, 133 Pac. 117; *Denney v. Arritola*, 31 Ida. 428, 174 Pac. 135; *Oregon Short Line R. R. Co. v. Mt. States T. & T. Co.*, 41 Ida. 4, 237 Pac. 281.)

The judgment is therefore affirmed. Costs awarded to respondent.

Budge, Holden and Morgan, JJ., and Koelsch, D. J., concur.