(No. 7006. February 11, 1943.)

IDAHO GOLD DREDGING CORPORATION, a corporation, Appellant, v. BOISE PAYETTE LUMBER COMPANY, a corporation, and UNITED PACIFIC INSURANCE COMPANY, a corporation, formerly United Pacific Casualty Insurance Co., Respondents.

[133 Pac. (2d) 1017.]

W. A. Johnston for appellant.

Richards & Haga for respondents.

HOLDEN, C.J.—This is an action on an injunction bond prosecuted by the Idaho Gold Dredging Corporation (hereinafter called the mining company) against the Boise Payette Lumber Company and the United Pacific Insurance Company, a corporation, formerly United Pacific Casualty Insurance Company, to recover damages in the form of attorney fees alleged to have been necessarily incurred and paid out in procuring the dissolution of an injunction.

This is the third appeal of this case to this court (*Idaho Gold Dredging Corporation v. Boise Payette Lumber Company et al*, 60 Ida. 127, 90 P. (2d) 688; same, 62 Ida. 683, 115 P. (2d) 401, wherein a very complete statement of the facts will be found). On the second appeal this court reversed the judgment of nonsuit theretofore entered by the trial court, dismissing the action of the mining company, and remanded the cause for a new trial. The cause was tried commencing November 4, 1941, by the court, sitting with a jury. November 5, 1941, the jury found for respondents and against the mining company. Whereupon

judgment was entered on the verdict that the mining company take nothing against respondents, from which judgment the mining company appealed to this court.

An examination of the record discloses there are two questions presented on this appeal: First, did the trial court misdirect the jury? If that question is decided against the contention of the mining company, then; Secondly, is the verdict supported by competent and substantial evidence?

These questions will be discussed in the order stated. The determination of the first question necessitates reference to pertinent pleadings and evidence. In its second amended complaint (paragraph XI), the mining company alleged:

"That by reason and on account of said injunction [referring to an injunction enjoining the collection of a judgment in favor of the mining company and against respondents] the plaintiff has been damaged in the reasonable sum of Five Thousand Dollars ($5,000.00) necessarily paid out and expended by the plaintiff as, and for, its necessary and reasonable attorney's fees incurred and sustained by reason of the services of its attorneys necessarily done and performed at the request of the plaintiff, by reason and on account of the said injunction and in securing and maintaining the dissolution of the writ of injunction, from the time of making and filing of said injunction order on March 12, 1935, to and including the final judgment in said injunction proceedings, as aforesaid; * * *."

Defendants and respondents answered as follows:

"These defendants deny generally each and every allegation contained in paragraph XI of said second amended complaint, and deny that plaintiff, Mining Company, incurred any expenses for attorney's fees or otherwise by reason of or because of the said temporary injunction having been issued by this court; but on the contrary these defendants allege the fact to be that whatever expenses the Mining Company incurred for attorney's fees, or otherwise, were incurred for the purpose of avoiding a final judgment or decision in said cause in favor of the Lumber Company, and the issuance of a permanent injunction in said injunction suit."

On the second appeal of the Mining Company to this

court, the record and opinion disclose the Mining Company attempted to prove, by parol evidence, that after the injunction suit was commenced by respondents against the Mining Company an oral agreement was made between the Mining Company and its counsel for the payment of attorney fees for services to be rendered in that suit, under which the Mining Company incurred the liability to pay for the services; that numerous questions were propounded to Atkinson, president of the Mining Company, by its counsel, to prove the making of the agreement and that such liability was necessarily incurred; that objections to such questions were sustained.

In remanding the cause for a new trial, on the second appeal, this court held the trial court erred in sustaining respondents' objections, pointing out that:

"If a controversy arose between the attorneys and the mining company as to whether the contingent fee contract obligated the attorneys to perform all necessary services in defending against the injunction suit and because of such controversy the contingent fee contract was modified or amended, and if under and pursuant to the terms of the amendment the mining company thereafter actually paid counsel for such services, *out of its own funds,* not with money which would have belonged to the attorneys under the contingent fee contract if not modified, then and in such case, the recovery of a reasonable attorney fee, not exceeding the amount actually paid and not exceeding the limit of the bond, may be had." [Emphasis ours.]

Accordingly, on the trial of the cause following the second appeal, the trial court permitted appellant to offer proof in support of its contention that a controversy arose between it and its attorneys and that because of such controversy, the written contingent fee contract was amended and an oral agreement made for the payment of attorney fees for services to be rendered in the injunction suit, and that the liability therefore was necessarily incurred. We come now directly to appellant's contention that certain of the trial court's instructions were "confusing, contradictory, and misleading," in that the court instructed the jury appellant "could not recover fees that were not 'necessary,' 'required' and 'necessarily' incurred on account of the injunction suit;" that the contingent fee contract "provided for all services rendered by attorneys, including those rendered in the injunction action, and made it the duty

of the attorneys to render services in the injunction action," and that appellant "could not recover unless it showed by the preponderance of the evidence that the written contract was modified, amended or supplemented, to provide for payment of additional fees for the injunction action."

It will have been observed that by paragraph XI of its second amended complaint appellant alleged, among other things, it had been damaged in the sum of $5,000.00 necessarily paid out "as, and for, its *necessary* and reasonable attorneys fees *incurred* and sustained by reason of the services of its attorneys *necessarily* done and performed at the request of the plaintiff, by reason and on account" of securing the dissolution of the injunction (emphasis ours). Having alleged, in substance and effect, the services performed by its attorneys in securing the dissolution of the injunction were *necessary* and that the liability to pay for such services was *necessarily* incurred, how can appellant insist the court erred in instructing the jury it must find "that the fees which plaintiff claims it paid its attorneys for appearing in the injunction suit were necessarily incurred," in view of the fact the court instructed the jury it must find the facts exactly as appellant alleged the facts to be.

Then the court, pursuant to appellant's claim and testimony offered to support it, that a controversy between it and its attorneys arose, and that by reason thereof the written attorney fee contract was modified and amended by oral agreement and a liability incurred thereunder to pay attorney fees for services in the injunction suit, over and above the compensation paid under the written attorney fee contract, instructed the jury:

"If you should find that plaintiff incurred liability and was compelled to pay compensation to its attorneys in such injunction suit, over and above the compensation paid under any existing contract of employment, then plaintiff is entitled to recover the reasonable value of such services not exceeding the amount of attorneys' fees actually paid, together with interest thereon at the rate of six per cent per annum from February 3, 1938, the date of filing this suit, to this date."

\* \* \*

"The burden of proof is on plaintiff and it must establish by a preponderance of the evidence that any change or modification of the contract, Exhibit 9 [referring to

the written attorney fee contract], for the payment of additional fees was made in good faith and that plaintiff's obligations for such fees were necessarily incurred for defending its rights in the injunction suit."

* * *

"Under this agreement [again referring to the written attorney fee contract] it was the attorneys' duty to represent the mining company at every stage of any proceedings which might involve the claim, including the contest of the injunction suit, *unless* from the evidence and by a preponderance thereof you find such written contract Exhibit 9 to have been modified, amended, or supplemented by a provision for the payment of additional fees in the injunction suit, and that such services were rendered under such modification." [Emphasis ours.]

These instructions correctly stated the theories of the respective parties as disclosed by the pleadings and evidence, that is to say, that a controversy arose between appellant and its attorneys and because of such controversy the written contingent attorney fee contract was amended and an oral agreement made for payment of attorney fees for services to be rendered in the injunction suit over and above the compensation paid under such written contract, as either pleaded or contended by appellant; and, on the other hand, that no controversy arose and that no oral agreement in good faith, was made nor liability incurred thereunder to pay an additional attorney fee, as either pleaded or contended by respondents.

It is the duty of the trial judge to instruct the jury upon every reasonable theory of either party finding support in the pleadings and evidence. (*Brown v. Yocum*, 113 Cal. App. 621, 298 Pac. 845, 846; *Graham v. Consolidated Motor Transport Co.*, 112 Cal. App. 648, 297 Pac. 617, 618; *Cassinelli v. Bennen*, 110 Cal. App. 722, 294 Pac. 748, 750; *Nelson v. Myers*, 94 Cal. App. 66, 270 Pac. 719, 724; *Ritchey v. Watson*, 204 Cal. 387, 268 Pac. 345, 347; *Murero v. Reinhart Lumber Co.*, 85 Cal. App. 385, 259 Pac. 494, 495.) Furthermore, the trial court should instruct upon respondents', as well as appellant's, theories of the case where appropriate instructions are presented, as in the case at bar, insofar as the instructions above quoted are concerned. (*Nash v. Meyer*, 54 Ida. 283, 302, 303, 31 P. (2d) 273.)

We conclude there is no merit in appellant's objec-

tion to the instructions. Hence, if the verdict of the jury against appellant is supported by substantial and competent evidence, the verdict will not be disturbed. (*Pennsylvania Gas Co. v. Whiteway*, 210 Fed. 782, 127 C.C.A. (9th) 332; *Gem State Sales Co. v. Rudin Bros.*, 55 Ida. 299, 41 P. (2d) 614; *Reinhold v. Spencer*, 53 Ida. 688, 26 P. (2d) 796; *Lightner v. Russell & 'Pugh Lmbr. Co.*, 52 Ida. 616, 17 P. (2d) 349; *Independent Gas & Oil Co. v. T. B. Smith Co.*, 51 Ida. 710, 10 P. (2d) 317; *Fralick v. Shuttleworth*, 49 Ida. 424, 289 Pac. 741; *Commercial Credit Co. v. Erum*, 47 Ida. 215, 273 Pac. 759; *Big Springs Land & Live Stock Co. v. Beck*, 45 Ida. 509, 263 Pac. 477; *Cooper v. Oregon Short Line R. R. Co.*, 45 Idá. 313, 262 Pac. 873; *Duthie v. N. R. Shepherd*, 32 Ida. 633, 186 Pac. 919; *The White Co. v. M. A. Means*, 28 Ida. 158, 152 Pac. 1050; *J. L. Baker v. First Nat. Bank of Caldwell*, 25 Ida. 651, 139 Pac. 565; *Johnson v. Fisher*, 23 Ida. 561, 131 Pac. 8; *Seawell v. Pacific Etc. Ry. Co.*, 21 Ida. 277, 121 Pac. 556.)

We turn now to a discussion of that (the second) question. The record discloses that March 4, 1935, counsel for the Mining Company wrote the company suggesting a meeting between the Board of the Mining Company and themselves for the purpose of discussing a rearrangement of the attorney fee contract, and further stating that:

"we all agree that the provisions concerning expense allowances to your company are not clear nor, on the other hand, is the provision clear as to the appellate work required to be done by the attorneys. I was quite satisfied with your suggestion that all the work done in the Idaho courts in the original case and also the work done in connection with the abortive certiorari proceedings that we should have an understanding to the effect that the fee division percentage remain as specified in the contract, but that your office expenditures approximating $7500 be allowed to you, assuming of course that they were really office expenses incurred after the contract was entered into and do not include overhead items of the corporation, and an allowance of $2500 to my firm and an allowance of $250 to Mr. Tennyson for his office expenses. I think. this arrangement is satisfactóry to Mr. Tennyson and it is to us.

"Now, the question comes up in connection with the new action brought by the lumber company against your

company. That, of course, was not in any way covered by our contract. I am not sure what procedure is going to be necessary to enforce our judgment. It is possible that we will have to sue the First National Bank. Of course, whatever is necessary to be done will have to be done no matter what procedure it entails, but this new action and any other actions and, of course, appeals from this new action require additional attorneys' fees."

April 17, 1935, the Mining Company answered the letter of its attorneys, in which it stated, among other things, that:

"We have given careful consideration to your request for a rearrangement of our attorney fee contract with you governing the amount of your retainer in the grease and oil case against the Boise Payette Lumber Company.

"The retainer contract of June 20th, 1929, was apparently quite satisfactory to you and ourselves at the time it was entered into and in substance this agreement provided that you should take this case, prosecute it diligently, defend all appeals and in case we were successful in obtaining a judgment, that you were to collect on that judgment by execution or otherwise and that you were to receive for your fee 50% of the first $50,000.00; 33 1/3% of the next $50,000.00 and 25% of all amounts collected in excess of $100,000.

"This retainer contract did not attempt to specify the many legal or court proceedings that might be necessary to enforce a judgment after it was once obtained, it simply stated in general, that you were to collect on the judgment.

"There was only one eventuality contemplated under this retainer contract and that was in the event of re-trial, then a different schedule of percentages was set up quite materially increasing your compensation.

"Apparently, when you drafted this retainer contract, you did anticipate the very worst thing that might have happened to us and that was that we might have to stand re-trial of the case and a special fee was set up to cover on that.

"Now it has developed in connection with our efforts to collect on our judgment that we are obliged to meet injunction proceedings and probably other proceedings to enforce our judgment and in this connection you feel that you should receive additional attorney fees.

"Regardless of what was contemplated under the contract we are inclined to compromise the matter to a certain extent for we realize it has been a hard case to fight and it has entailed more work on your part than was originally contemplated and it may require a lot more legal work before we can collect on the judgment . . ."

Mr. S. K. Atkinson, president of the Mining Company, who represented it in its dealings with the Mining Company's attorneys, testified:

"Q. Mr. Atkinson, I believe you stated that there was no particular controversy between the mining company and its attorneys. Will you state the history of any discussions you had with your attorneys, beginning with these letters?

"A. Well, the letters speak for themselves; and there was nothing further said or done about it until we finally settled the thing up.

"Q. I see. Then those two letters were written and the matter was dropped entirely?

"MR. JOHNSON: The date of the first letter read to your gentlemen was March 4, 1935, and the second letter April 17, 1935.

"Q. You had no further discussions with your attorneys, then until October 20, 1936; is that correct?

"A. I believe that's correct.

     * * *

"Q. How well, Mr. Atkinson, do you remember those discussions?

"A. Well, I have a fairly good recollection of what was done at the time.

"Q. Well, beginning with what the discussions were based upon, can you in a general way tell the jury what happened there leading to the payment of the $5,000 attorney's fees?

"A. Well, all I remember is that we paid the attorney's fees in the injunction case.

"Q. Mr. Atkinson, will you state to the jury just what was said, as nearly as you can remember, by the attorneys and yourself when you met on October 20th [the date final settlement is said to have occurred].

"A. *Well, there was no controversy. The attorneys came in to get their fees, and we paid them. That's all there*

*was to it. There was nothing said, only to issue the checks and pay them.*

\* \* \*

"Q. What I am asking you is this: You say there was no further discussion after those letters were written. You got together and delivered the checks. Is that a correct statement?

"A. We got together that day and settled.

"Q. In other words, you say now there was a conversation?

"A. Oh, there were many conversations, but nothing relating to any dispute in regard to fees on the 'Grease case'.

"Q. Now, what I would like to know is whether your statement is the same as it was this morning, or not. After these letters were written, Mr. Johnston asked you did you have any conversations about these fees that you are trying to sue for here?

"A. Yes, I did.

"Q. And this morning you said you didn't?

"A. Well, I misunderstood the question. It was limited to that day that we made the settlement. Everything was ironed out prior to that time.

"Q. Well, what did you mean by the statement that after these letters no further discussion was had until October 20, 1936? What did you mean by that?

"A. Nothing other than there was an understanding relative to the injunction suit.

"Q. Well, now, was there any agreement other than those two letters, Exhibits 5 and 6? [Above-quoted letters.]

"A. *Those are not an agreement.*

"Q. Where is the agreement?

"A. The agreement is here.

"Q. You mean this agreement we have here, Exhibit 9? [The written attorney fee contract.]

"A. Yes.

"Q. That's the agreement you refer to?

"A. Yes.

\* \* \*

"Q. And what I am getting at, Mr. Atkinson, was or was not there some discussion, some conversation there at the time the fees were paid, relative to either the 'Grease case' action or the injunction, and the payment of the fees in those actions?

"A. Just a suggestion on the part of one of our attorneys as to the distribution.

* * *

"Q. I thought you had testified that outside of these letters, you had no conversation with the attorneys since that time.

"A. *No controversy, I said.*

* * *

"Q. Anyway you complied with his request as to the mechanics of handling?

"A. I did.

* * *

"Q. So that, taking these two checks, the amount that you paid Mr. Tennyson of $24,903.32, was exactly one-half of the $49,806.43 which you said was due under the contract of retainer?

"A. Well, that's true.

"Q. That is all I want to know?

"A. *It happened to be that.*

"Q. *So Mr. Tennyson was not paid a penny more than the amount which was due under this contract of retainer; that is true?*

"A. *That happens to be the case.*

"Q. *I say, the answer is 'Yes', isn't it?*

"A. *Yes.* [Emphasis ours.]

* * *

"Q. Did you, Mr. Atkinson, as a matter of fact, pay to the attorneys for their fee in the 'Grease case' action the sum of $49,806.43?

"A. No.

"Q. What sum did you say the attorneys?

"A. $47,306.43.

"Q. Then you never did make the payment called for by the contract of retainer marked Defendant's Exhibit 9? [The written attorney fee contract.]

"A. No.

"Q. And that fee of $47,306.43, plus $5,000.00 gave the total of all the fees paid the attorneys in the two actions; is that correct?

"A. That is correct.

\* \* \*

"Q. Well, as I understand you now, Mr. Atkinson, your company owed the attorneys $49,806.43 under the original retainer fee contract; is that correct?

"A. No, that isn't correct; you read the wrong figure. You gave the wrong figure, forty-four thousand nine—

"Q. No, I thought I said $49,806.43.

"A. That is the figure that figured out under the percentage agreement as outlined in the retainer contract.

"Q. And now you tell us that you didn't pay them what you owed them; you just paid them $2,500.00 less, and so you gave them separate checks for those fees, and took a receipt so that you could recover under a bond against the lumber company.

"A. That is not true.

"Q. Well, you didn't pay them all you owed them, you said.

"A. That is correct; we didn't pay them all we owed them under the retainer agreement.

\* \* \*

"Q. Well, didn't you pay Luther Tennyson exactly $24,903.06?

"A. Yes.

"Q. And you paid that to him in two checks?

"A. That's right.

"Q. So you paid him just exactly what you owed him under the old retainer contract, but you paid him that in two checks?

"A. Well, the $2,500.00 check had nothing to do with the old retainer contract.

"Q. But you actually paid him the exact amount which you said you owed to him under the old retainer contract?

"A. That happens to figure out.

\* \* \*

"Q. $2,500.00. In other words, to the one-half of the

fee that you mentioned was due under that retainer contract, you paid him $2,500.00.

"A. That's right.

"Q. Now, is that exactly the amount that you agreed to pay Mr. Hawley for his office expense, in your Exhibit Number 6?

"A. Yes.

"Q. So that, Mr. Atkinson, did you pay Mr. Hawley any amount or any money in excess of one-half of the fee which you computed was due under the retainer contract, plus the $2,500.00 which you agreed to pay him as office expenses in this Exhibit 6?

"A. (No answer.)

"Q. Did you pay him any money in addition to that?

"A. Nothing only—than what I have stated. I have got it right here. The checks are evidence of what I paid him."

This evidence shows, without dispute, that while the Mining Company's attorneys suggested a meeting of the board "for the purpose of discussing a re-arrangement of our attorney fee contract", no meeting of the board was ever held and, in fact, nothing was ever done about it, as above testified by Mr. Atkinson. The reason no meeting of the board was ever held and nothing done about a re-arrangement of the attorney fee contract may well have been that the Mining Company did not think there should be a rearrangement of the contract, in that it told its attorneys in its letter to them [above quoted]:

"The retainer contract of June 20th, 1929, was apparently quite satisfactory to you and ourselves at the time it was entered into and in substance this agreement provided that you should take this case, prosecute it diligently, defend all appeals and in case we were successful in obtaining a judgment, that you were to collect on that judgment by execution or otherwise and that you were to receive for your fee 50% of the first $50,000.00; 33 1/3% of the next $50,000.00 and 25% of all amounts collected in excess of $100,000.00.

"This retainer contract did not attempt to specify the many legal or court proceedings that might be necessary to enforce a judgment after it was once obtained, it simply stated in general, that you were to collect on the judgment."

Quite clearly the Mining Company then thought that while the attorney fee contract "did not attempt to specify the many legal or court proceedings that might be necessary to enforce a judgment after it was once obtained, * * * that you [meaning its attorneys] were to collect on the judgment"; and, of course, the judgment theretofore recovered by the Mining Company against the Lumber Company could not be collected until the injunction suit then pending to restrain its collection, was defeated. Moreover, the position of the Mining Company concerning the suggested rearrangement of the attorney fee contract, at the time its letter was written, very clearly appears to have been this: That under the terms and conditions of the attorney fee contract, its attorneys were required to collect the judgment after it was once obtained, which, by the way, is, and has always been, the position taken by respondents.

Furthermore, the president of the company himself testified "there was no controversy. The attorneys came in to get their fees, and we paid them. That's all there was to it. There was nothing said, only to issue the checks and pay them." Of course, if there was no controversy between the attorneys and the Mining Company regarding the payment of additional attorney fees for services to be rendered in the injunction suit, payment for such services would hardly have been *necessary* or *necessarily* incurred, as alleged by appellant. And, further, there is substantial evidence supporting respondents' contention that, as a matter of fact, the Mining Company did not pay its attorneys anything more than was due them under the retainer or attorney fee contract. In that respect. Mr. Atkinson testified:

"Q. So that, taking these two checks, the amount that you paid Mr. Tennyson of $24,903.32, was exactly one-half of the $49,806.43 which you said was due under the contract of retainer?

"A. Well, that's true.

"Q. That is all I want to know?

"A. It happened to be that.

"Q. So Mr. Tennyson [one of the Mining Company's attorneys] was not paid a penny more than the amount which was due under this contract of retainer; that is true?

"A. That happens to be the case.

"Q. I say, the answer is 'Yes', isn't it?

"A. Yes."

Whether appellant paid its attorneys *only* the amount due them under the attorney fee contract; whether a controversy arose between the Mining Company and its attorneys; whether, on that account, an oral agreement was made by which the Mining Company agreed to pay its attorneys additional fees for services to be rendered in the injunction suit; whether a liability to pay for such services was necessarily incurred were questions of fact for the jury to determine. (*Owen v. Taylor*, 62 Ida. 408, 114 P. (2d) 258, 263.)

In conclusion: The verdict of the jury being supported by substantial, competent evidence, it will not be disturbed.

The judgment must be affirmed, and it is so ordered. Costs awarded to respondents.

Givens and Dunlap, JJ., and Buckner and Porter, D.JJ., concur.