300 P.2d 494

Royden ZENIER, Plaintiff-Respondent,

v.

SPOKANE INTERNATIONAL RAILROAD
COMPANY, a corporation,
Defendant-Appellant.

No. 8316.

Supreme Court of Idaho.

July 10, 1956.

Greene & Hunt, Sandpoint, Whitla & Knudson, Coeur d'Alene, for appellant.

198

Nixon & Mitchell, Bonners Ferry, for respondent.

SMITH, Justice.

Appellant's railroad extends generally in an east-west direction through the North Half of Section 31, Township 62, Range 1 East of the Boise Meridian in Boundary County. Respondent owns cultivated lands in said section adjoining and to the north of appellant's railroad right of way.

The west side of respondent's land is bordered by the drainage ditch and dike, extending in a north-south direction, of Drainage District No. 1 of Boundary County. A small maintenance road runs along the top of the dike. Just west of the southwest corner of respondent's land where this dike road crosses the railroad, appellant maintains a wire gate in good condition. The crossing is known as the Fish Creek Crossing.

Appellant's railroad right of way borders the south line of respondent's land for a little over a mile. Appellant during 1953 maintained a wire fence along its right of way for a distance of approximately one-eighth mile at the west end of the south borderline of respondent's land. At the east end of this fence a stub fence extended southerly and then up the railroad fill to a point near the railroad track, but there was no cattle guard between the end of the stub fence and the track.

Except for the one-eighth mile there was no fence on the south borderline of respondent's land. At times in the past that portion of respondent's south line had been fenced but the fence had been allowed to run down and deteriorate.

Appellant's railroad bed is on a fill extending east from the Fish Creek Crossing along the full length of respondent's south line. The fill is about 12 feet wide on top and the sides slope downward and outward, at about a 45-degree angle, some 15 feet on the slope from the top to the bottom of the fill. The fill is made mostly of large rock on the sides with gravel on top.

December 7, 1953, at about 11:50 A.M., respondent's registered 13 year old quarter-horse mare and her 9 months old purebred stud colt were struck and thereby killed by appellant's locomotive at a place just to the east of the Fish Creek Crossing where appellant's railroad right of way adjoins respondent's cultivated fields.

Respondent's action is grounded on failure of appellant to erect and maintain a fence along its right of way adjoining respondent's land, by reason whereof respondent's two horses entered in and upon appellant's right of way and railroad track where they were struck and killed by appellant's locomotive. Respondent sought to recover $900 damages as the value of the horses and $300 statutory attorneys fees.

Appellant generally denied the allegations of respondent's complaint and affirmatively alleged negligence on respondent's part in allowing his animals to run at large in said vicinity.

Trial of the action was had by jury. The jury returned a verdict, upon which the trial court entered judgment, in favor of respondent totaling $1200, made up of damages of $600 for loss of the mare and $300 for loss of the colt, and statutory attorneys fees of $300.

Appellant perfected an appeal from the judgment.

Several of appellant's specifications of error present for review the main question involved, as appellant states it to be, "In this case the defendant [respondent] has simmered his case down to the lack of a lawful fence."

The duty of a railroad company to erect and maintain lawful fences along its railroad, and liability for its failure to do so is set forth in I.C. § 62–406, which provides in part:

"Every railroad company or corporation operating any steam or electric railroad in this state shall erect and maintain lawful fences, not less than four feet high, on each side of its road, where the same passes through or along inclosed or adjoining cultivated fields or inclosed lands, * * *.

"Until such fences, * * * shall be duly and properly made, installed and maintained, such railroad company or corporation shall be liable in a civil action to any and all person or persons who may sustain any loss, injury or damage by the wounding, maiming or killing of any horse [and certain other animals] * * * which shall be done by such railroad company * * *, in the operation and management of engines, cars, or other rolling stock, upon or over such railroad, whether such person or persons operating or in charge of such engine, cars or other rolling stock were guilty of negligence or not; and such railroad company or corporation shall also be liable in a civil action to any and all persons who may sustain any loss, injury or damage by the wounding, maiming or killing of any horse * * * which shall be done by such railroad company * * in the operation or management of engines, cars, or other rolling stock upon or over such railroad, if any such animal or animals escape from adjoining lands and come upon the right of way or railroad tracks of such railroad company or corporation, occasioned by the failure of such railroad company or corporation to construct and maintain such fences, * * * whether the person or persons operating or in charge of such engine, cars or other rolling stock were guilty of negligence or not; but after such fences * * * shall have been duly made, installed and maintained, such railroad company or corporation shall not be liable for any such damages, unless negligently or wilfully done, and in all actions for the recovery of damages under this section, proof of the wounding, maiming or killing of such animal or animals by such railroad company or corporation, shall be prima facie evidence of negli-

gence or wilfullness on the part of such railroad company or corporation."

A lawful fence is defined by I.C. §§ 35–101 and 35–102. Such a fence must be not less than four and a half feet high, and the bottom board, rail, pole or wire must not be more than twenty inches above the ground, with the space between the top and bottom well divided; provided that a stone fence or a worm fence of rails may be four feet high; also a fence may be made in whole or in part of brush, ditch, pickets, hedge or other materials, but to be lawful such a fence must be equal in strength and capacity to turn stock as compared to other constructed fences described.

Respondent testified that with the exception of the west one-eighth of a mile at the south border of his land, there was no man-made fence, nor any barricade "other than the railroad fills, very large rock, and like that" along his south border during 1953.

His testimony then appears:

"Q. Well, could horses negotiate the fill and go on up the railroad tracks? A. In spots.

"Q. Along your field? A. Yes.
* * * * * *

"Q. Have you ever ridden horses from your land—from your field up on to the S and I track? A. I have.

"Q. On several occasions? A. Yes.

"Q. Then it is possible for horses to negotiate the fill there? A. Yes, several places.

* * * * * *

"A. The cattle had gotten up on the track a number of times and they had moved some of the larger rock."

Mr. Tinney, respondent's witness, after stating his familiarity with respondent's ranch, including the cultivated field adjoining appellant's railroad, testified:

"Q. And is it possible for horses to go through that field up to the track?

A. Very easily."

Mr. Casey, who was appellant's section foreman for some time prior to and during December, 1953, gave testimony of a negative character. When asked if stock could easily climb the fill, he stated, "Well, it didn't seem to me they would climb it. * * * Looks to me like they would have to be driven to get them up there."

Mr. Casey then testified that the railroad fill had been put in before his time and that he had buried cattle, and horses too, along the track where it was not fenced, i. e., where there had been a fence along the fill on "the north side for a ways," which had been "allowed to deteriorate and go down."

Mr. Casey also testified that he remembered driving three of respondent's horses off the railroad track at a point about one-half a mile toward Bonners Ferry, east

from where respondent's two horses were killed, *without placing the time of such incident*, but placing its location in the area where is situate the railroad fill bordering respondent's cultivated land; and respondent had *some five or six horses in addition to the quarter-horse mare and her colt.*

Mr. Casey "thought" that the mare and colt came through the gate at the Fish Creek Crossing since on his daily tours of inspection five days a week he had found the gate left open frequently, and the bodies of the horses, when found, were in the near vicinity of the crossing at the foot of the railroad fill.

The testimony of respondent is positive as to his tracing the tracks of the horses east from the vicinity of the Fish Creek Crossing to the end of the one-eighth mile fence where the cattle guard used to be. In that respect he testified, "And she [the mare] had been running before she got to the place where the cattle guard used to be * * * and I crossed the tracks and noticed where the colt was running on the other side of the track going west. Both the animals had been running west." Respondent described how he could tell that the animals had been running; his testimony in that respect being:

"A. Well, an animal that is running will throw gravel and their feet are working together. A horse walking is only working one foot at a time.

They don't throw gravel when they are walking.

"Q. Then you could actually tell the horses were running? A. I certainly could in my own mind."

He was able to place their entry onto the railroad track past where the one-eighth mile fence ended and where there was no cattle guard. His testimony in that regard being as follows:

"Q. How far back did you track them? A. Well, it was past the end of that fence.

* * * * * *

"Q. Was there a cattle guard at the end of that fence? A. . No.

"Q. Across the track? A. No.

"Q. There had been at one time and that had been removed, is that so? A. Yes.

* * * * * *

"Q. Mr. Zenier, those horses ran down the track how far? A. They ran—they were running past the end of that fence or near the cattle guard, and how much further than that, I don't know.

"Q. It would be at least one eighth of a mile? A. I would say at least that far, approximately."

The evidence is positive and sufficient to show that the railroad fill in

places may not have conformed to the statutory requirements of a lawful fence as to its capacity, in places, to turn stock, as compared to other types of fences; also that appellant did not maintain a cattle guard at one place where the law may have required it so to do. The evidence is also positive and sufficient to show that respondent's horses came onto appellant's railroad track at a place east of the one-eighth mile fence, where the railroad fill was the only "fence" along the south border of respondent's cultivated fields. The issues in regard to those matters, including the statutory definitions of lawful fences, and the statutory liability for failure to erect and maintain the same were properly submitted to the jury. Appellant's assignments in that regard are not well taken.

The rulings announced in Saccamonno v. Great Northern Ry. Co., 30 Idaho 513, 517, 166 P. 267, 269, are applicable here; therein this Court stated:

"While there is no direct proof as to the exact point where the horse entered upon the right of way, there is ample evidence to support the finding of the jury * * * that the horse was killed by appellant company at or near a point where it was required to fence. And we do not think the mere absence of direct and positive proof that the horse went upon the right of way at a particular point, in view of the fact that the fence was down in numerous places

in the immediate vicinity, would defeat respondent's right of recovery."

 Appellant assigns error of the trial court in permitting testimony by respondent, over objection, of the construction by appellant at a time after respondent's horses were killed, of a wire fence along the railroad right of way at the south border of respondent's cultivated lands.

Respondent, in the first instance, at the time of the trial November 15, 1954, testified without objection being made that his south line was fenced. Later, again without objection, respondent testified to the same effect; appellant then made an objection based upon immateriality, without designating the grounds of immateriality, which objection the court overruled. Appellant made no motion to strike the answer thusly elicited. The third time, appellant's witness Mr. Casey, not then in appellant's employ, in answer to a question propounded to him, stated that he had not erected a fence along the north side of the track; and the next question to him, which assumed that the new fence had been built, appellant neither objected to nor moved to strike. Moreover, such evidence was material, not for the purpose of showing antecedent negligence on appellant's part, but as evidence of appellant's recognition of a defect which it was bound to remedy, Skottowe v. Oregon S. L. & U. N. Ry. Co., 22 Or. 430, 30 P. 222, 16 L.R.A. 593; also

to show that the condition, existing at the time of the accident, had been remedied, Foster v. University Lumber & Shingle Co., 65 Or. 46, 131 P. 736.

Appellant next assigns error of the trial court in permitting respondent and certain of his witnesses to testify in regard to the value of the mare and colt. Respondent in his complaint alleged the value of the mare to be $600 and the colt $300.

Respondent produced witnesses experienced with horses, who knew and had observed respondent's mare and colt, who had knowledge of and were interested in purchasing quarter-horses and of prices recently quoted for them in various localities in Texas, Oregon and Washington in buyer-seller markets, and one of the witnesses owned quarter-horses. Those prices testified to, varied up to $800 for a mare and up to $600 for a colt, similar to the respective animals which respondent lost. Appellant made specific objections, in some instances as to the competency of certain of the witnesses to so testify, but did not object to the testimony on direct examination of respondent's witness Mr. Tinney, an owner of quarter-horses, who testified to respective values of the mare and colt in excess of the values which respondent alleged, and the cross examination of such witness went to the question of the weight to be accorded his testimony rather than to his competency.

Respondent, while unable to show either a buyer's or a seller's market for quarter-horses in his immediate vicinity of Bonners Ferry, nevertheless testified as to the value to him of the mare and colt, and those values, as he so testified, and as found by the jury, did not exceed the values which respondent alleged in his complaint.

Where personal property, which is injured or destroyed by the wilful or negligent act of another, has no market value, its value to the owner may be used as a basis for determining damages. Heiligmann v. Rose, 81 Tex. 222, 16 S.W. 931, 13 L.R.A. 272; Hodges v. Causey, 77 Miss. 353, 26 So. 945, 48 L.R.A. 95; Southern Express Co. v. Owens, 146 Ala. 412, 41 So. 752, 8 L.R.A.,N.S., 369; Austin v. Millspaugh & Co., 90 Miss. 354, 43 So. 305; St. Louis I. M. & S. Ry. Co. v. Dague, 118 Ark. 277 176 S.W. 138; Aufderheide v. Fulk, 6 Ind.App. 149, 112 N.E. 399; Wilcox v Butt's Drug Stores, 38 N.M. 502, 35 P.2d 978, 94 A.L.R. 726; Sarkesian v. Cedric Chase Photographic Laboratories, 324 Mass. 620, 87 N.E.2d 745, 12 A.L.R.2d 899; 15 A.Jur., Damages, sec. 125, p. 534; Annotation 12 A.L.R.2d 902.

It is the function of the jury to pass upon the weight of the evidence. Allen v. Laudahn, 59 Idaho 207, 81 P.2d 734; Summerfield v. Pringle, 65 Idaho 300, 144 P.2d 214; Poulsen v. New Sweden Irr. Dist., 67 Idaho 177, 174 P.2d 206; Mason v.

**205**

Mootz, 73 Idaho 461, 253 P.2d 240. The credibility of witnesses is for the jury. Mitchell v. Atwood, 55 Idaho 772, 47 P.2d 680; Anderson v. Ruberg, 66 Idaho 417, 160 P.2d 456; Poulsen v. New Sweden Irr. Dist., supra.

Where the evidence is conflicting on the material issues of fact, it is the province of the jury to find on such conflicting evidence. Lorang v. Randall, 27 Idaho 259, 148 P. 468; Shallis v. Fiorito, 41 Idaho 653, 240 P. 932; Cooper v. Oregon Short Line R. Co., 45 Idaho 313, 262 P. 873; Alsup v. Saratoga Hotel, 71 Idaho 229, 229 P.2d 985; Bowman v. Bowman, 72 Idaho 266, 240 P.2d 487. Whenever there is substantial evidence to support a verdict the same will not be set aside. I.C. § 13–219; Idaho Gold Dredging Corp. v. Boise Payette Lumber Co., 64 Idaho 474, 133 P.2d 1017; Poulsen v. New Sweden Irr. Dist., supra; Macomb v. Extension Ditch Co., 70 Idaho 202, 214 P.2d 464; Hooton v. City of Burley, 70 Idaho 369, 219 P.2d 651; Shepard v. Smith, 74 Idaho 459, 263 P.2d 985.

We find no merit in appellant's assignment of error in regard to admission of testimony relating to the amount and reasonableness of statutory attorneys fee to be allowed respondent since appellant has not supplied authorities or argument in support thereof. Sup.Ct.Rule No. 41; State v. Richardson, 56 Idaho 150, 50 P.2d 1012.

We deem it unnecessary to consider appellant's remaining assignments of error.

The judgment of the trial court is affirmed. Costs to respondent.

TAYLOR, C. J., KEETON and ANDERSON, JJ., and BAKER, D. J., concur.