327 P.2d 758

R. E. MANLEY, Sam L. Gross, Sidney Moore and Sterling R. Miller, Plaintiffs-Respondents,

v.

Jack R. MacFARLAND and Jean R. Mac-Farland, husband and wife, Boise Payette Lumber Co., a corporation, Thomas E. Mangum and Emily R. Mangum, husband and wife, Defendants-Appellants.

BOISE PAYETTE LUMBER CO., a corporation, Cross-Complainant-Appellant,

v.

Jack R. MacFARLAND and Jean R. MacFarland, husband and wife, Thomas E. Mangum and Emily R. Mangum, husband and wife, R. E. Manley, Sam L. Gross, Sidney Moore, Sterling R. Miller, Clifford C. Adamson, Ollie M. Taylor, doing business as Taylor & Sons Linoleum Store, and D. J. Hall, Cross-Defendants.

No. 8545.

Supreme Court of Idaho.

Jan. 21, 1958.

On Rehearing Aug. 4, 1958.

314

Richards, Haga & Eberle, J. L. Eberle and W. D. Eberle, Boise, for appellants.

Frank F. Kibler, Nampa, for respondents.

SMITH, Justice.

Plaintiffs joined in this action to foreclose their several claims of mechanics' liens, recorded March 6, 1954, directed against real property situate near Nampa, described in the complaint, owned by defendants MacFarland and wife. The claims represented plaintiffs' unpaid wages for carpenter work performed in the construction of a dwelling in and upon the real property. Defendant Boise Payette Lumber Co., herein referred to as the Company, was named a defendant as the owner and holder of a first mortgage encumbering the real property, recorded September 11, 1953, to secure payment of $13,000. Defendants Mangum and wife were named defendants as holders of a second mortgage, encumbering the premises, recorded April 6, 1954.

The Company in its answer and cross-complaint included as cross-defendants, parties in addition to plaintiffs, i. e., Clifford C. Adamson, Ollie M. Taylor, doing business as Taylor & Sons Linoleum Store, and D. J. Hall, who allegedly claimed an interest in the real property.

The defaults of defendants MacFarland and wife, and Mangum and wife, and of cross-defendants Clifford C. Adamson, Ollie M. Taylor, doing business as Taylor & Sons Linoleum Store, and D. J. Hall, were duly entered for failure to answer and plead in the action.

The Company, by its cross-complaint, sought to foreclose its mortgage and have the principal sum of the promissory note, the interest, and incidental sums and expenses secured by the mortgage, adjudged a first lien against the lands and premises ahead of plaintiffs' mechanics' liens.

Plaintiffs, by their answer, affirmative defense, and new matter alleged, sought to assert their several liens as first priorities against the real property, ahead of the Company's mortgage, on grounds hereinafter discussed, although they commenced work on the dwelling after the Company had recorded its mortgage.

The district court at the conclusion of the trial, entered findings of fact and conclusions of law. Its judgment of foreclosure of all the liens, then entered December 14, 1956, adjudged the lien of the Company's mortgage to be prior and superior to the several liens of plaintiffs, excepting however, as to the liens of plaintiffs Manley, Gross and Moore for their work performed after February 1, 1954, together with interest on the respective amounts, and for their incidental expenses incurred in perfecting such portion of their liens. The amounts so adjudged in favor of those plaintiffs, with priority ahead of the Company's mortgage, appear as follows:

| Name | Labor | Interest | Atty. Fee | Recording | Total |
|------|-------|----------|-----------|-----------|-------|
| R. E. Manley, | $383.62 | $56.01 | $110.00 | $5.00 | $554.63 |
| Sam E. Gross | 321.75 | 47.09 | 100.00 | 5.00 | 473.84 |
| Sidney Moore | 363.37 | 52.94 | 100.00 | 5.00 | 521.31 |

The Company appealed from the portion of the judgment adjudging and decreeing such partial priorities to the named lien claimants.

■  The Company by certain of its assignments questions whether plaintiffs' answer, which includes the affirmative defense and allegations of new matter, states facts sufficient to constitute a counterclaim of first priority of plaintiffs' several mechanics liens as against the allegations of the Company's cross-complaint, of first priority of its mortgage lien. In that connection the Company asserts that plaintiffs, in their answer to the Company's cross-complaint, "have not asked for any relief or stated a claim of action in fraud."

Plaintiffs, by their answer, affirmative defense and allegations of new matter, traverse the Company's allegation of first priority of the lien of its mortgage. Plaintiffs then allege that the transaction between the Company and MacFarlands in essence was to arrange construction of a dwelling house under an agreement whereby the Company was to pay for labor performed, and construction materials furnished in furtherance of its business of selling such materials, from funds the repayment of which was secured by its mortgage; that the Company's Nampa agent and retail yard manager knew that plaintiffs had performed labor on the dwelling and had not been paid, and that plaintiffs, through plaintiff

Moore, informed said agent and yard manager that since they had not been paid "they might as well quit and file liens on the property." Plaintiffs then ground their right to first priority of their several mechanics liens upon alleged representations of the Company's agent and yard manager made February 1, 1954, under alleged apparent authority, to the effect that if plaintiffs would continue working as carpenters until completion of the dwelling, the Company "would take the same over and pay the labor, or sell the same and pay the labor"; that plaintiffs, relying upon such representations, and believing them to be in good faith, continued the construction of the dwelling to substantial completion without claiming liens thereon or pursuing any course of action to procure payment of their labor, by work stoppage or legal action. Plaintiffs contend, by reason of such circumstances and resultant inequities, that the Company should be estopped from asserting first priority of its mortgage lien ahead of plaintiffs' several liens.

Simply stated, plaintiffs allege that the Company's agent and yard manager represented with apparent authority that if plaintiffs would continue their work on the building to substantial completion the Company would, by certain procedures, see to it that they were paid. Such constituted a material statement of fact relating to the then present status of things, the then existent transaction, and not a promissory statement or expression of opinion as to the future. Such is true simply because the Company possessed the ability by virtue of its mortgage to convert the fruits of the labor to cash. It is axiomatic that plaintiffs' labor on the building allegedly performed at the instance and request of the Company resulted in enhancement of the value of the property, securing payment of the Company's mortgage. Moreover plaintiffs by their allegations claim inequitable conduct on the part of the Company.

Appellant's assignment is without merit. Plaintiffs' counterclaim and new matter alleged state facts sufficient to constitute a counterclaim of first priority of their several liens for labor, against the Company's allegations of first priority of its mortgage lien.

■ The Company, by its several assignments, questions the sufficiency of the evidence to sustain the trial court's adjudication of first priority, in part, of the several mechanics liens of plaintiffs Manley, Gross and Moore, ahead of the Company's first mortgage lien. The Company, in support thereof, asserts insufficiency of the evidence to show Mr. Norell's apparent authority exercised on the Company's behalf whereby the Company must be held to have recognized the rights of plaintiffs Manley, Gross and Moore to priority payment of the portion of their several liens, securing their wages earned after February 1, 1954, ahead

of amounts secured by the Company's mortgage.

The trial court found certain basic facts, hereinafter related, concerning which there appears to be no substantial dispute.

The mortgage, executed September 13, 1953, securing payment to the Company of MacFarlands' demand note of $13,000, was of record when plaintiffs commenced working as carpenters on the dwelling. The mortgage, among other things, was given to secure—

"the faithful performance of *the certain agreement between the parties* hereto dated the 11th day of September, 1953, relating to the construction of improvements upon the above described premises." (Emphasis supplied).

The parties entered into the referred to agreement September 11, 1953; it will hereinafter be referred to as the Agreement. The Company, under the Agreement, was authorized to advance from time to time the moneys, repayment of which was secured by the mortgage. The Agreement, among other things, contained the following provisions:

"1. Upon written request of Owners or either of them in the form approved by Company for advances to pay for labor performed, materials used or other costs in connection with such construction * * * it shall advance the same to the person or persons des-

ignated in such written requests, it being understood and agreed that owners will purchase from Company for the construction and completion of said improvements, all such materials as are usually and ordinarily handled and sold by Company and that all materials heretofore or hereafter furnished by Company to said Owners, or either of them, however ordered, shall be deemed to be and be advances hereunder at the then current price charged by the Company for such materials, provided that Company shall not be obligated to advance hereunder in the aggregate total amount more than Thirteen Thousand and No/100......Dollars ($13,000.00)"

"4. In the event any liens or encumbrances are filed upon said property or any part thereof described in said mortgage, * * * then the Company, in any of said events, shall have the right and option of paying any or all of such liens * * *, completing said improvements or any of them, and all amounts so expended by said Company shall be advances hereunder * * * and shall also be secured by said mortgage as advances thereunder; provided, that such remedies are cumulative and that in any such events said Owners shall be in default * * *."

The Company maintained a retail lumber and supply yard at Nampa. The Company through the Nampa outlet furnished

the building materials for the construction of the MacFarland dwelling. The Company, by the end of January, 1954, had supplied materials, for which it made advances to itself, amounting to the sum of $3,732.47. Through February, March and April, 1954, it supplied additional materials and made advances to itself therefor, in the sum of $1,222.01. The total of the materials which it so supplied and paid for amounted to the sum of $4,954.48.

The Company by the end of January, 1954, had made advances to MacFarland, or to his order, amounting to the sum of $4,869.20; through February and through March 6, 1954, when plaintiffs filed their mechanics liens the Company had made like advances amounting to $1,239.80 and thereafter it made like advances amounting to $1,916.29. The total of such advances amounted to the sum of $8,025.29.

Mr. Norell, the Company's Nampa yard manager, handled and signed certain of the orders for materials; also, he signed a number of the drafts at the request of MacFarlands, owners, disbursing the Company's funds, the repayment of which was secured by the mortgage, to sub-contractors and firms furnishing supplies, labor and equipment. He did not advance any funds for the payment of carpenter labor, nor particularly to any of the plaintiffs.

Plaintiffs, commencing the late fall of 1953, worked as carpenters intermittently on the dwelling until January 8, 1954. None of them performed further work on the dwelling during the remainder of January, 1954. During the interim from January 8, to February 1, 1954, plaintiff Moore talked with MacFarland about payment of the wages. MacFarland was attempting to negotiate a loan from a finance company. MacFarland told plaintiff Moore, sometime after the middle of January, 1954, that "the loan didn't go through."

February 1, 1954, plaintiff Moore conferred with Mr. Norell, the Company's Nampa yard manager, on the matter of payment of plaintiffs' back wages. At that time plaintiffs were considering the matter of filing of their claims of lien against the property. Plaintiff Moore testified as to what took place at that conference and thereafter as follows:

"A. I asked Mr. Norell about the money for the carpenters and he told me then, why, there was no money set up in the loan for carpenter labor, and I said, 'Well * * *'

* * * * * *

"A. And I said, 'Well, if that is the case, there is no money, we might as well quit and file our liens on the property and quit.' 'Well,' he said, 'Don't do that,' he said, 'Give us a chance and the company will either take the house over and pay the carpenters their money, or the company will take the house

over and sell it and pay the carpenters what their labor is.' "

*     *     *     *     *     *

· "Q. * * * Did you report your conversation with Mr. Norell to the other carpenters?

*     *     *     *     *     *

"A. I went to the job and reported to the other carpenters and we went to work and finished the house."

Plaintiffs Manley, Moore and Gross then worked on the dwelling, substantially completing it, until past the middle of February, 1954.

Mr. Norell admitted having had conversations with plaintiff Moore on several occasions concerning payment of the wages, but denied that he requested plaintiffs to continue working, or that he had stated that the Company would take the property over or sell it and pay plaintiffs. He made sundry trips to the property during the progress of the work and saw plaintiffs working. He remembered a remark made on one occasion at the job, although he did not remember whether MacFarland or plaintiff Moore made it, to the effect:

"A. If they [plaintiffs] would come back to work and help him [MacFarland] finish the house he would sell so that they could get the money."

On cross examination, however, Mr. Norell testified:

"Q. * * * You don't know who told you that for certain. A. No, I couldn't say * * *."

He knew that the carpenters were working on the dwelling after the discussion concerning the nonpayment of their wages. His testimony then appears:

"Q. Mr. Moore could have had this conversation with you * * * but you don't recall it at this time, is that correct? A. I don't know who it was that made the remark."

The Company's assistant general manager testified that Mr. Norell was the Company's yard manager at Nampa in the transaction of furnishing materials from the Company's Nampa retail yard for construction of the MacFarland dwelling; also that his duties included the exclusive handling of the disbursements of the funds secured by the mortgage; that it was understood under the Agreement that MacFarlands would purchase from the Company all materials which it usually handled, for the construction of the dwelling.

The assistant general manager was "quite sure" that the Company had not furnished architectural services, and denied that it furnished supervisional services. He stated that the Company's only responsibility was disbursement of the mortgage secured $13,-000, to itself for materials furnished and to others upon written orders of the owner MacFarland. Nevertheless an item of dis-

bursement of $65 to the Company appears on December 9, 1953, with a supporting invoice showing that the disbursement was for "Plans Spec. and Architectural services rendered on House plan No. 13245." Further, the Agreement provided that the Company approve the plans and specifications. Such renders inconsistent the Company's position that it did not render architectural but only drafting services, and that it only sold the plans to the MacFarlands.

The assistant general manager also stated that it was the responsibility of the yard manager to visit the job in progress from time to time and to take orders for materials. Mr. Norell stated that he visited the dwelling several times during its construction to see that the materials were supplied during construction, and that the Company's "draftsman" went with him several times. Mr. Norell also admitted advising plaintiffs, as follows:

"A. I told them * * * the way to protect their interest, was to file a lien."

Failure of the owner to pay liens constituted a default under the mortgage with consequent accrual of the foreclosure action. The Company, in its complaint, sets out as one of the grounds of the accrual of the foreclosure action, the filing of the liens, rendering the mortgagors in default under the mortgage.

The evidence discloses that from and after February 1, as well as from and after March 6, 1954, the Company had on hand sufficient unexpended funds, repayment of which was secured by the mortgage, to pay plaintiffs Manley, Moore and Gross for their labor performed during February 1954. The evidence, though somewhat conflicting, also shows that those plaintiffs returned to the carpenter work on the dwelling February 1, 1954, relying upon the Company's representations and at its instance and request. Further, the Company's Nampa yard manager knew that the labor to be so performed constituted a lienable item against the dwelling; also he advised plaintiffs to file claims of lien at a time when the Company still had on hand sufficient moneys with which to pay them, *at its option* under the Agreement, from the funds, repayment of which was secured by the mortgage.

The evidence, though conflicting in some respects, supports the finding of the trial court, that the Company's Nampa agent and yard manager "in general represented the Company, as the Company's agent and employee during the course of the construction of the dwelling house and acted with apparent authority." Particularly the Company cannot be permitted to retain the benefits of plaintiffs' labor, under the circumstances shown without recognition of the accompanying burdens.

■ A principal will not be permitted to claim that its agent acted beyond his authority when such acts were within the apparent scope of the agent's authority and the obligations incurred were for the benefit and protection of its interests. Madill v. Spokane Cattle Loan Co., 39 Idaho 754, 230 P. 45. The rule is stated in Stout v. McNary, 75 Idaho 99, 103, 267 P.2d 625, 627, as follows:

"The principal cannot claim that an agent with apparent authority to act had no such authority when he claims benefits of such agent's acts. He cannot approve the part that is beneficial to him and reject the part that creates a burden."

And in Texas Company v. Peacock, 77 Idaho 408, 414, 293 P.2d 949, 952, appears the following statement:

"Where an agent has acted within the apparent scope of his authority and the third party dealing with the agent has relied upon the appearance of authority to such party's detriment, then in theory the principal becomes estopped to deny the agent's apparent authority to do the particular act or acts in controversy."

See also Pettengill v. Blackman, 30 Idaho 241, 164 P. 358; Hammitt v. Virginia Min. Co., 32 Idaho 245, 181 P. 336; 2 C.J.S. Agency § 29, p. 1063; 2 Am.Jur., Agency, pp. 82–88.

■ The rule is well established, that where the findings of the trier of facts are supported by substantial and competent, though conflicting evidence, the findings will not be disturbed on appeal. I.C., sec. 13–219; Watkins v. Watkins, 76 Idaho 316, 281 P.2d 1057; Land Development Corp. v. Cannaday, 77 Idaho 237, 290 P.2d 1087; Summers v. Martin, 77 Idaho 469, 295 P.2d 265; Zenier v. Spokane International R. Co., 78 Idaho 196, 300 P.2d 494; Nelson v. Hoff, 70 Idaho 354, 218 P.2d 345; Lanning v. Sprague, 71 Idaho 138, 227 P.2d 347.

■ Lastly, the Company contends that plaintiffs' claims of lien filed against the property, presumptively community, of defendants, Jack R. and Jean R. MacFarland, husband and wife, are not valid since the claims name only Mr. MacFarland as owner or reputed owner, citing Willes v. Palmer, 78 Idaho 104, 298 P.2d 972. That case does not support the Company's contention; though it involved a claim of lien naming only the husband as the owner or reputed owner, this Court did not rule upon the validity of the claim.

This Court, in Gem State Lumber Co. v. Union Grain & Elevator Co., 47 Idaho 747, 278 P. 775, 776, upon invoking the rule of liberal construction of the lien law, held that failure to state the name of the record owner of the property in the claim of lien, was not fatal since it appeared that such owner "was in no manner

misled by the mistake, but had been apprised of the lien claim."

Herein it is not indicated whether Mrs. MacFarland is, or was at the time of the trial, a record owner of the property, together with her husband. Suffice it to say, though she is not named in the lien claims as an owner or reputed owner, neither she nor her husband is shown to have been prejudiced in any manner by reason of the omission. Further, though both were apprised of the lien claims they chose not to appear and plead to plaintiffs' complaint, which includes them as parties defendant, whereby plaintiffs seek foreclosure of their several claims of lien. Rather, they waived all defenses, if any they had, by suffering entry of their defaults; thereby they are deemed to have consented to entry of the decree foreclosing their community interests in the property. I.C., sec. 10–801; Heintzsch v. LaFrance, 3 Cal.2d 180, 44 P.2d 358; Lindsey v. Drs. Keenan, Andrews & Allred, 118 Mont. 312, 165 P.2d 804, 163 A.L.R. 487; Svetina v. Burelli, 87 Cal.App.2d 707, 197 P.2d 562; 49 C.J.S. Judgments § 201, p. 357.

The judgment of the district court is affirmed. Costs to plaintiffs-respondents.

PORTER and TAYLOR, JJ., concur.

KEETON, C. J., dissents.

McQUADE, Justice (dissenting).

I cannot concur in the result reached by the majority, nor in their approach in arriving at the conclusion. The record fails to support the inferences stated.

On Rehearing

SMITH, Justice.

Appellant, on rehearing, urges that the record fails to show apparent authority of its yard manager to bind appellant, relying upon Chamberlain v. Amalgamated Sugar Co., 42 Idaho 604, 247 P. 12, and 2 Am. Jur., Agency, sec. 102, p. 83, to the effect that apparent authority is derived from a previous course of dealing, and that it is the conduct of the principal and not that of the agent that binds the principal.

The rules announced in those authorities are not applicable in the case at bar, since evidence of such a course of conduct is not the only way to show apparent authority. The theory of estoppel, since it is essentially similar to that of apparent authority, may be applied in establishing apparent authority. "Apparent authority, like estoppel is applied by the courts only to bind the principal, in which case the elements of apparent authority and estoppel, the facts upon which they are based, and the results achieved are the same." 2 Am.Jur., Agency, sec. 104, p. 88. The original opinion is ground-

ed upon such theory, as are the several decisions of this Court cited and quoted from in the opinion.

We adhere to our original opinion.

TAYLOR, J., and BAKER, District Judge, concur.

McQUADE, Justice, with whom KEETON, Chief Justice, concurs (dissenting).

A review of the record discloses the findings of fact entered by the trial court in some instances are not warranted by inferences of the evidence. It must be pointed out that insofar as the Boise Payette company is concerned—the only principal defendant insofar as this Court is concerned—there is no contract of employment in the record upon which a judgment can be sustained. That is to say, no knowledge of the contract of employment between the respondents and the owners of the premises can be imputed to the Boise Payette corporation, as the record explicitly eliminates that testimony from having any force and effect on that company:

"Q. Mr. Manley, at the time that you went to work there, did you have any arrangement with Mr. MacFarland as to being paid? A. Yes, Mr. MacFarland said, 'I want you to work on the house, I want you to work on my house', and he said, 'I have arranged'—

"Mr. J. L. Eberle: We object to any statement Mr. MacFarland made as being binding on us.

"Mr. Kibler: We consent it wouldn't be binding on Boise-Payette.

"Mr. J. L. Eberle: No contract is pleaded.

"The Court: It would not be binding on the defendant Boise-Payette Lumber Company. You are asking judgment against MacFarland, are you not?

"Mr. Kibler: Yes.

"The Court: I will let him answer. The objection is overruled."

The apparent authority theory upon which the majority opinion is based resorts to the same type of thinking as is expressed in the findings of fact, in that there was certain evidence introduced pertaining to work performed by B. M. Norrell for the purpose of giving a foundation to the idea that Norrell had the apparent authority not only to employ the respondents, but to waive lien priority of the appellant corporation. The record does not support this conclusion, because nowhere do the respondents testify they knew of such course of conduct and use of authority on the part of Norrell, nor do they testify that they in fact relied on such apparent authority to their injury. Likewise, there is no testimony in the record as to common

usage of such authority in the construction industry upon which they could have placed reliance.

The very best the record can disclose is that Norrell contracted for the employment of the respondents to finish the carpenter work upon the premises. In proceeding upon this assumption, the respondents' action must then be based upon contract with the Boise Payette corporation.

There should be no interference with lien rights, inasmuch as they are statutory in nature and have been clearly interpreted by this Court. The rule at common law, and that applicable to equitable liens, is identical to that laid down in Bunt v. Roberts, 76 Idaho 158, 279 P.2d 629, 630, which requires the work done or materials furnished to be requested or authorized by or through the one who is seised of an interest in the res:

"A tenant or lessee is not generally considered the agent of the lessor within the interpretation of the mechanics' lien law merely by virtue of the relationship of landlord and tenant, and a tenant or lessee cannot subject the interest of his landlord to a mechanic's lien by reason of the tenant's contract with a materialman or laborer, unless the owner does some act in ratification of, or consent to the work done and the furnishing of the material or labor. 36 Am.Jur. 73, Secs. 93 to 95;

Rio Grande Lumber & Fuel Co. v. Buergo, 41 N.M. 624, 73 P.2d 312, 123 A.L.R. 1; Boise-Payette Lumber Co. v. McCornick, 36 Idaho 788, 213 P. 1119.

"The estate or property of a lessor is not subject to a mechanic's lien for improvements contracted for by his lessee unless the lessor has made him his agent or otherwise conferred the requisite authority on him, or ratified his acts, or is estopped to deny the validity of the lien. 57 C.J.S. Mechanics'

Liens § 65, p. 559; Mundet Cork Corp. v. Three Flowers Ice Cream Co., Mo. App., 146 S.W.2d 678; Masterson v. Roberts, 336 Mo. 158, 78 S.W.2d 856, 97 A.L.R. 862."

In the case at hand, the Boise Payette corporation is at best a materialman, and not seised of an interest in the property. The corporation has a mortgage on the premises, but this does not give rise to a legal right on its part to alienate the fee or any part thereof as against the owner. It is elementary in lien law that one who does not possess seisin cannot invoke the right of a mechanic's or a materialman's lien. Therefore, there is no authority, in law or in equity, by which a lien could be imposed upon the res of this controversy.

Insofar as this record is concerned, the appellant has no knowledge of the agree-

ment between respondents and the owner-builder MacFarland. There is no evidence upon which it can be said that MacFarland ratified the acts of the respondents and thereby complied with the requirements as discussed in Bunt v. Roberts, supra.

It is the conclusion of this dissenting opinion that the judgment should be reversed.