**McCOMB v. QUAKER OATS CO.**
**No. 13199.**

United States Court of Appeals
Fifth Circuit.
Feb. 13, 1951.

---

Willard B. Wagner, Jr. (of Williams, Lee & Kennerly), Houston, Tex., for appellant.

James E. Henderson, Sherman, Tex., for appellee.

Before HOLMES and RUSSELL, Circuit Judges, and DOOLEY, District Judge.

DOOLEY, District Judge.

The Quaker Oats Company (Quaker) sued W. P. McComb, Sr. on a verified account covering four carloads of feed for $11,930.72. This and another related but presently unimportant suit were consolidated. McComb, Sr., a retired lawyer, in ill health, lived in the country several miles from Conroe, Texas. His son, Austin McComb, late in 1946, began carrying on a business called McComb Grain Company (Grain Company), owned either by the father or the son at that time, in Conroe, but the son quit in the early part of 1947 and the business was then inactive for several months. The said Grain Company had stocked products of Quaker. In May 1947 Messrs. Henry and Watts, agents of Quaker, had a meeting with McComb, Sr. to discuss reopening the Grain Company. They worked out the plan that McComb, Sr. would place one Cecil in charge and reopen the business, but McComb, Sr. definitely restricted his personal credit and liability on purchases from Quaker to the first two carloads of feed and thereafter on the two carloads then unpaid from time to time, provided that the invoice for the second preceding carload for the time being was first fully paid each time before the shipment of another carload. The practical way this would work, as the parties had in mind, was that after the first two carloads were shipped, payment had to be made for the first carload before the third carload was ordered or else shipped, likewise payment had to be made for the second carload before the fourth carload was ordered or else shipped, and so on. The said arrangement was by oral agreement on May 17, 1947, and is undisputed, except for a faint line of divergence over whether the said payment had to be made before the next car was ordered or before it was shipped. In that connection, and on the same day, McComb, Sr. delivered to Henry, at his request, a written acknowledgment addressed to Quaker and reading as follows: "Until further notice I am the owner of the McComb Grain Company of Conroe, Texas."

No claim is made that said letter was intended to supersede the above oral agreement restricting the liability of McComb, Sr. In fact the contrary is clearly indicated in a subsequent letter of May 26, 1947 from Henry to McComb, Sr. reading in material part as follows:

"As we discussed in Conroe, we will ship the McComb Grain Company two cars of our feed on credit, but when the third car is ordered we will expect to receive a check from the Company for the oldest outstanding invoice. This, or course, is also limited to a maximum extension of credit for no longer than 30 days from the date of each invoice.

"I don't believe we will have any trouble in keeping the account in line on this basis, but if it ever should be necessary for us to write Mr. Cecil regarding any payments that are due, I will try to remember to send you a copy of my letter."

Furthermore in October 1947 Henry, aware that a carload of feed had been shipped to the Grain Company in violation of said agreement, became uneasy and himself went to Conroe to hold up unloading the car, but on learning that McComb, Sr. was ill in a hospital, he abandoned such intention.

The plaintiff Quaker sought to hold the defendant McComb, Sr. liable on the theory that he was the owner of the Grain Company, at least from the time Cecil took charge of it, and as such owner was personally liable in full on the debt to plaintiff. The defendant McComb, Sr., on the contrary, contended that Cecil was the owner of the Grain Company, and that the defendant was merely a guarantor, subject to the limitation of liability above explained, and that any liability as guarantor had been discharged by violation of the conditions governing his guaranty. The trial court, on sufficient but conflicting evidence, found that McComb, Sr. was owner of the Grain Company.

During the time the above oral agreement was in force Quaker on orders from Cecil shipped to the Grain Company respective carloads of feed, ten in all, on various dates from May 27, 1947 to October 15, 1947. The first three of said carloads were paid for punctually in keeping with the aforesaid working agreement. All went well as long as the rule laid down by McComb, Sr. was followed. But from the middle of August to the early part of October Cecil delivered checks at intervals to Quaker, some postdated, for the amounts due on the fourth, fifth, seventh and sixth carloads in that sequence. The bank refused payment on all of these checks, for lack of funds in the account, although the first one on being sent back to the bank a second time was paid. During this same period the account got so out of hand that when the ninth car had been shipped on September 27 the invoices for five successive carloads were then unpaid, and Quaker held in its hands two dishonored checks for the fifth and seventh carloads respectively. Contemporaneously Quaker acquiesced in Cecil bypassing payment for the sixth carload, shipped August 22, which was the largest invoice incurred to that time. In fact Quaker went ahead and shipped the seventh carload on September 11, the eighth carload on September 17, and the ninth carload on September 27, while the invoice for the sixth carload stood unpaid. True that on September 29 a good check was received for the fifth and seventh carloads, thus covering two of the five outstanding invoices, but the point is that the season of bad and postdated checks, along with the bypass of the sixth carload invoice and the pyramiding of the five shipments, had riddled the careful precaution of the original credit arrangement. This state of affairs also made a favorable opportunity for a squanderer, and there is such an intimation in the record against Cecil. At any rate he was irresponsible and carried on in a loose way. The McComb Grain Company under Cecil's management foundered soon afterwards. These transactions were altogether between Quaker and Cecil. Cecil was not well known either to McComb, Sr. or Quaker. Neither Quaker nor Cecil notified McComb, Sr. of what was taking place, and he did not keep in close touch with the business, nor know of the alarming trend of things. Further there is no evidence or even claim that McComb, Sr. received or had the use of any funds from the business during the Cecil tenure. Quaker might have been justified in treating the first dishonored check as having been inadvertent in some way, particularly when it was paid on the second round to the bank, but the next bad check by business prudence should have been a

danger signal. The advent of postdated checks was another plain warning. Quaker took chances and the venture turned out badly. On the other hand it could have saved any loss by merely adhering to the simple routine which was required by its understanding with McComb, Sr.

The ninth carload was shipped at a time when the seventh carload was unpaid, and the sixth and eighth carloads also were still unpaid. When the tenth carload was shipped not only the eighth carload, but also the ninth and sixth carloads were still unpaid, although a few days before a bad check had been received for the sixth carload. In other words, the ninth and tenth carloads were both unauthorized purchases as to McComb, Sr. Cecil stayed on a short time, and reduced the overdue invoice for the sixth carload by some partial payments, which apparently left the business far stripped. The term of the original credit arrangement naturally ended with Cecil's exit.

Henry, agent for Quaker, and McComb, Sr. met again at this juncture on November 4, 1947. McComb, Sr. at this time had learned that the tenth carload was shipped in violation of the credit agreement but did not know all else that had happened. Quaker had to think about its unpaid account including the entire invoices on the eighth, ninth and tenth carloads. McComb, Sr. had to think about any salvage possibilities. They were together in the view that with Cecil out it would be worth trying to hold the business together as a going concern a while longer and in that way better conserve the assets. McComb, Sr. had in mind one Ivy to take charge of the business. The outcome of the negotiations was that Cecil and wife, styling themselves owners, executed in form a bill of sale agreement covering the assets of the Grain Company, to said Ivy, and he took charge but really as trustee. Henry admits that this instrument was notice to him that the Cecils, rather than McComb, Sr., were then claiming to be owners of the Grain Company. McComb, Sr. said at the time that he would be willing to stand liable personally for one-half if Quaker would stand the other one-half of another carload of feed for the Grain Company. Henry agreed for Quaker. The so-called eleventh carload, being the first after Ivy took charge, was shipped under that agreement. Later, on order of Ivy, but without the knowledge or approval of McComb, Sr., Quaker shipped the twelfth carload in question. Ivy, using receipts of sales from the new stock of feed, made remittances to Quaker paying in full the outstanding invoice on the eighth carload. The remaining four carloads, ninth, tenth, eleventh and twelfth, are now in suit.

The trial was non-jury and the Court rendered judgment for the plaintiff Quaker against McComb, Sr. for the full amount of the verified account in suit. The plaintiff said McComb, Sr. was owner. McComb, Sr. said he was guarantor. The trial Court said both. He was exonerated by the Court as guarantor, except for one-half of the eleventh carload invoice, on the ground that liability failed under the conditions of his guaranty, but at the same time he was held liable as owner for the whole account. This puts the case in an odd framework. The trial Court did not hold that McComb, Sr. was putative owner by estoppel, and instead found that he was real owner in fact, yet not that alone but also real guarantor. The premise of McComb, Sr. in his own person being both principal and guarantor as to the same obligation is hard to rationalize. We think he was only one or the other. This perplexity seems traceable to the coexistence of the ownership letter and the oral agreement, both stubborn facts in this record. The letter seems to have been somewhat decisive in finding that McComb, Sr. was owner, and the oral agreement decisive in finding he was guarantor. But the oral agreement may well be looked at in another light. That agreement had the informality of an unstudied business talk. It was not preoccupied with distinguishing the exact relationship between McComb, Sr. and Cecil. Obviously the single purpose was to hedge the liability of McComb, Sr. for feed shipped by Quaker to the Grain Company. That becomes a lost purpose, however, though McComb, Sr. is released theoretically as guarantor, but at the same time is held

in full as principal. The letter and the agreement were both evolved together in the same transaction and it should be assumed that the parties meant a consistent purpose for the two. It was only natural that Henry as a matter of ordinary business prudence desired some writing in connection with the transaction, rather than let it all rest in parol, but the letter and the agreement are not irreconcilable. The oral agreement fits just as well whether or not McComb, Sr. was owner of the Grain Company. If he had been really guarantor such agreement would have been a limitation on the extent of his liability, and likewise as owner it was a limitation on the extent of his liability to Quaker. The limitation was known to Quaker, and we hold that the dealings between Quaker and Cecil are subject to the familiar rule that one dealing with an agent when he knows the actual limits of such agent's authority, cannot hold the principal on any unauthorized transaction, unless it be on the ground of subsequent ratification.[1]

■ Counsel for Quaker say that at least since McComb, Sr. agreed to be liable for two carloads of feed it should have judgment against him for the last two carloads shipped while Cecil ran the Grain Company. This misconceives the principle of the liability of McComb, Sr. The credit arrangement did not naturally imply the certainty of any ultimate liability of McComb, Sr. outside the resources of the Grain Company. The limitations imposed by McComb, Sr. were well suited in tendency to safeguard the solvency and stability of the Grain Company. It was the time honored policy of pay as you go. The Grain Company might have paid its own way under the restraint of said credit arrangement. At any rate the liability of McComb, Sr. was limited to authorized indebtedness. He authorized Cecil to order the first two carloads of feed and he authorized him to order succeeding carloads of feed so long as the second preceding invoice was paid

off before a new carload was shipped, and according Cecil could incur indebtedness on the credit of McComb, Sr. to the extent of two carloads of feed if done within the bounds of the directions specified by McComb, Sr. but that does not mean that McComb, Sr. could be made liable for two unauthorized carlots.

■ The question is simpler as to the dealings between Quaker and Ivy. Henry then unmistakably knew that McComb, Sr. whatever might have been the fact, had gone along with Cecil's claim that he and his wife were the owners of the Grain Company at the time the bill of sale was made to Ivy. He also knew that Ivy was a kind of an interim trustee, and that it was intended only as a temporary expedient. Those circumstances together with the undisputed fact that McComb, Sr. only said that he would stand liable for one-half the cost of one carload of feed, was quite enough to put Henry on notice that this was the limit of his liability. Nor, so far as the record shows, did any of the resale proceeds from the eleventh and twelfth carloads go to the payment of any preexisting debt legally owed by McComb, Sr. to Quaker. True such receipts, or some thereof, were used to pay for the preexisting invoice covering the eighth carload, but that invoice was not an authorized liability against McComb, Sr., since the sixth carload was still unpaid, and Quaker had only a bad check on the seventh carload, at the time the eighth carload was shipped.

We reach the conclusion that McComb, Sr. is liable for one-half the invoice on the first carload of feed shipped while Ivy was in charge of the Grain Company, and we do not see any ground in the record to enlarge said liability on the principle of ratification.[2]

The judgment of the trial court is reformed by reducing the principal sum thereof to $1,434.09, and with that modification same is affirmed.

1. American National Bank v. Bartlett, 10 Cir., 40 F.2d 21; Thane Lumber Co. v. J. L. Metz Furniture Co., 8 Cir., 12 F. 2d 701; Hayward Lumber Co. v. Cox, Tex.Civ.App., 104 S.W. 403; American Lead Pencil Co. v. Wolfe, 30 Fla. 360, 11 So. 488; Hawthorn Coal Corp. v. Blair, 134 Va. 44, 113 S.E. 742; Truscon Steel Co. v. Cooke, 10 Cir., 98 F.2d 905.

2. Hoskins v. City of Orlando, 5 Cir., 51 F.2d 901.