407 P.2d 312

COMMERCIAL INSURANCE CO., a corporation, Plaintiff-Appellant,

v.

HARTWELL EXCAVATING CO., Inc., a corporation, Defendant-Respondent.

No. 9508.

Supreme Court of Idaho.

Oct. 27, 1965.

Rehearing Denied Nov. 17, 1965.

Holden, Holden & Kidwell, Idaho Falls, for appellant.

Petersen, Moss & Olsen, Idaho Falls, for respondent.

KNUDSON, Justice.

Shortly prior to November 11, 1960, respondent, Hartwell Excavating Co., Inc., was seeking to establish a line of bonding credit in anticipation of bidding for a contract with the City of Idaho Falls (hereinafter referred to as "City") to construct a public works project known as The West Side Sewer System (hereinafter referred to as "Project"). During said period respondent, through its president, George A. Hartwell, contacted appellant through its agent, Kenneth J. Dehnert, and for the purpose of establishing such credit submitted to appellant respondent's financial statement.

Under date of November 11, 1960, respondent completed an application form furnished by appellant entitled "Application for Contract Bond." Some irregularity occurred regarding the name of the company to which the application was addressed; however, it is admitted that the application was made to and acted upon by appellant.

Pursuant to said application appellant, by and through its agent Dehnert, supplied to respondent a bid bond for the project. This bond together with respondent's bid was submitted to the City for consideration in awarding a contract relative to the construction of the project. Respondent was thereafter notified that it was the successful bidder and was requested to submit a performance bond together with an executed contract for the construction of the project. Respondent thereupon requested appellant, through its agent Dehnert, to provide the required performance bond.

At the request of appellant an abstract of the bids relative to the project was furnished by respondent. Upon learning that respondent's bid was substantially lower than the engineer's estimate and $43,658.76 below the next low bid, appellant proceeded to make further investigation concerning re-

**536**

spondent and its bid. Thereafter appellant demanded as a condition to the issuance of the performance bond that respondent furnish additional collateral security in the amount of approximately $40,000.00. Respondent was unable to provide such security and consequently could not obtain a performance bond from appellant. Respondent's being unable to meet the requirement of furnishing a performance bond made it impossible for it to enter into the contract for the construction of the project.

Pursuant to demand made upon appellant by the city attorney, appellant paid to the City, pursuant to its obligation under the bid bond, the sum of $8,770.10. Appellant thereafter made demand upon respondent to indemnify appellant for the sum so paid to the City. Respondent denied liability therefor and appellant commenced this action seeking recovery of said amount against respondent allegedly under the indemnification provisions contained in the application. Trial was had before the court sitting without a jury. Judgment was entered denying recovery to appellant, from which judgment this appeal is taken.

Appellant has enumerated twenty-three assignments of error, the substantial portion of which may be grouped into three principal contentions as follows:

(1) The trial court erred in finding that custom or usage was applicable to the factual situation in this case.

(2) The court erred in finding that appellant's agent Dehnert had apparent authority to make representations to respondent and in concluding that appellant was estopped to deny its agent's apparent authority.

(3) The court erred in concluding that respondent was not obligated to reimburse appellant for payments made by appellant to the City.

■ In considering the first mentioned contention we find that in respondent's answer as an affirmative defense it is alleged:

"That at all times mentioned in the complaint there existed in the construction business in Idaho Falls, Idaho, and vicinity a well established and well understood custom and usage to the effect that if a surety executes a bid bond in favor of a principal and the principal is the successful bidder, that the surety will execute a performance bond on behalf of the principal for the performance of said contract, all as plaintiff well knew and understood."

This allegation is sufficient to put in issue the practice of the business here involved as it existed in the area of Idaho Falls and vicinity. Appellant raises the issue as to whether the alleged usage or custom was shown to exist in the area alleged.

■ It is generally recognized that a custom or usage which may affect the rights of a party to a contract must be one that has existed for such length of time as to become generally known and practiced in the area in question or in reference to the particular trade or business with which it is connected. 55 Am.Jur., Usages and Customs, §§ 4-9.

■■ The foundation for the introduction of evidence of usage or custom is a showing of a series of acts of a similar character performed at different times. Ames Mercantile Co. v. Kimball S.S. Co., D.C.N.D.Cal.1903, 125 F. 332. Evidence of a habit of doing a thing in the course of business is, if clearly shown as a definite course of action, admissible as indicating that, on a particular occasion, the thing was done as usual. Roberts Distributing Co. v. Kaye-Halbert Corp., 126 Cal.App.2d 664, 272 P.2d 886; 31A C.J.S. Evidence § 180, p. 457. In the case of Romero v. H. A. Lott, Inc., 70 N.M. 40, 369 P.2d 777, the court had under consideration an issue as to whether the handrail on a platform was a safety device in general use in the building construction industry and stated:

"We have held that custom or usage is a matter of fact and not of opinion. * * * but, that proof of the fact may be established either by testimony of specific uses, * * * or by evidence of general practice of contractors, * * *."

In the instant case respondent called Mr. Arrington, a resident of Idaho Falls, who had been engaged in the general contracting business for twenty-eight years, doing work in Montana, Wyoming, Utah and Idaho. He testified that a custom existed in the Idaho Falls area in this type of business relative to the issuance of performance bonds by a bonding company when the contractor to whom the bonding company has issued a bid bond, is successful in being offered the contract bid on; essentially the custom is, to paraphrase the testimony, that you arrange for a performance bond at the time you apply for a line of credit and if you are awarded the contract you get the performance bond, the bid bond being incidental to the situation. He further testified that:

"Q Now Mr. Arrington, in your experience what is the custom if a bid bond has been issued relative to the following through with a performance bond?

"A In our experience, over 28 years, the performance bond has been forthcoming immediately for every job that a bid bond has been issued."

The witness Harold Shydler, a resident of Idaho Falls, engaged in the general contracting business most of his life, and in Idaho about twelve years, testified that he

knew of such a custom and that within his experience "I have never known of any occasion within my own experience where a bid bond has been issued to a contractor and the bonding company has then refused to issue a performance bond, other than in this specific case."

A witness, Mr. Metcalf, testified that he was a resident of Idaho Falls, engaged in conducting a general insurance agency in that area for approximately eight years; that he solicits bids and performance bonds for the United States Fidelity & Guaranty Company; that he knew of a like custom and that "in my experience the custom is that if a contractor is successful and is awarded the bid, the company will issue the performance bond."

Mr. Larter, a resident of Idaho Falls, engaged in insurance, bonds, and real estate business, which included the writing of contract bonds for public works contracts, testified that he knew of such a custom, and further stated:

"A From my own experience, I have never written a bid bond until it was understood with the company that they were going to write the performance bond. I have never had that—it's never come up in 26 and one-half years; I never had any problem on it.

"Q Do you know of a situation, from your own experience, where a bid bond has been written and the company has refused to write a performance bond?

"A No, I do not, neither from my own experience nor have I heard of it other than this particular case; however, it may have happened. But in this particular area I have never known of it ever occurring before. It's certainly never happened, as far as I am concerned, in my own bonding business."

One I. E. Catherman, an employee of appellant company, was called by respondent for cross-examination. In describing his duties as an employee of appellant in this state, he stated: "Well, I'm the Branch Manager of the Boise office; I'm the State Agent, Special Agent, Inspector, appraiser; practically all activities of the company in the State with the exception of adjusting." This witness testified as follows:

"Q Do you know of any situations in the State of Idaho where your company has written a bid bond and has failed to follow through with a performance bond to the successful bidder?

"A No."

Mr. Dehnert, appellant's agent who supplied the bid bond here involved, when being interrogated relative to a statement made to Mr. Hartwell relative to a performance bond, stated:

"A Well, I would say it was an answer I have given quite a few times before, that if the company will issue a bid

 **539**

bond the chances are they will issue the performance bond. Or, more often my answer would be they would not issue the bid bond unless they would \* \* \* issue a performance bond."

This witness further testified as follows:

"Q Then did you go on and say, 'And for the time I have been in business, which is approximately twelve years here, or thirteen, I hadn't seen the time they wouldn't issue a performance bond when a bid bond was issued.'

"A Right."

In this connection Mr. Hartwell, when requested to state the purpose or reason why he inquired of Mr. Dehnert about a performance bond, stated:

"A If I can't get a performance bond I don't want a bid bond because I can't—I'm just hung, that's all there is to it. If I get a bid bond and am low bidder and can't get a performance bond, then what do I do? I realize that a bid bond is forfeit if the performance bond isn't put up, and I can't afford to gamble the price of the bid bond. So I specifically asked him so I would know for sure where I was at, because I wouldn't have turned in a bid if he hadn't given me a bid bond and assurance that I would get a performance bond. I asked him specifically."

 We conclude that the usage described by the witnesses is a reasonable one and did not contravene any principle of law. This court has held that a custom must be clearly proved. Dingler v. Simpson, 83 Idaho 439, 364 P.2d 181. Although there may be some contradictions in the testimony, the record discloses that the trial court's finding and conclusion on this issue is adequately supported by substantial and competent evidence.

Under several assignments of error appellant contends that the trial court did not correctly apply the legal rule applicable to evidence of usage and custom. The record does not support such contention.

 It has long been recognized by this court that evidence of custom or usage may not be introduced to vary or contradict the terms of a plain and unambiguous contract. Gramkow v. Farmers Cooperative Irr. Co., 47 Idaho 578, 277 P. 431; Ehlinger v. Washburn-Wilson Seed Co., 51 Idaho 17, 1 P.2d 188. However, proof of a usage or custom is justified when there is ambiguity or uncertainty upon the face of a written contract arising out of the terms used therein, and may be used to the extent of clearing obscurity. There are well established general rules governing the admissibility of such evidence, and we consider the following statements which are quoted

from 55 Am.Jur., Usages, § 27, to be appropriate in this case:

"The broad general rule is that proof of a valid usage or custom is admissible to annex incidents to a written instrument, to aid in its construction, and to ascertain the intention of the parties in reference to matters about which the contract is silent, provided such usage or custom is not contradictory of or inconsistent with the plain terms of the written agreement and its effect is not to add to or ingraft any new agreement or stipulation thereon. * * Evidence of usage and custom is not, however, admitted for the purpose of varying or contradicting the plain terms of an unambiguous contract, and will not be permitted to overturn the agreement between the parties. Evidence of custom is permitted for the purpose of ascertaining the meaning of a contract where otherwise ambiguous or uncertain of providing for incidents not in contradiction of the fundamental provisions of the contract, and of supplying omissions under certain circumstances which have occurred in the agreement of the parties. * * * Where construction or interpretation of a written instrument is involved, the primary purpose in permitting parol evidence of a custom to be introduced is to enable the court to arrive at the real meaning and intention of the parties, but such evidence is only permissible in cases where the intent cannot be ascertained from the terms of the contract."

It is also recognized to be a general rule that when there is a known usage of a trade or business, persons carrying on that trade are deemed to have contracted in reference to the usage, unless the contrary appears. California Lettuce Growers v. Union Sugar Company (1955), 45 Cal.2d 474, 289 P.2d 785, 49 A.L.R.2d 496; Simons v. Stokely Food (Wash., 1950), 216 P.2d 215; Arch Sellery, Inc. v. Simpson (Wyo., 1961), 360 P.2d 911; Strong v. Ringle (1915), 96 Kan. 573, 152 P. 631. In Robinson v. United States, 13 Wall. 363, 80 U.S. 363, 20 L.Ed. 653, it is stated:

"Parties who contract on a subject matter concerning which known usages prevail, by implication incorporate them into their agreements, if nothing is said to the contrary."

The trial court in substance stated as a conclusion that evidence of usage and custom was used and considered in this case as an aid to the interpretation of the agreement to enable the court to arrive at the real meaning and intention of the parties. The court considered the application for contract bond (Exh. 2) to be ambiguous with respect to whether appellant was ob-

ligated to write the performance bond after the bid bond had been executed by it. The application was entitled "Application for Contract Bond" and after providing for the name, address and other data relating to applicant listed all three bonds (bid, performance and payment) in the following form:

"Amount of Bond? Bid $ 5% Performance $ 100% Payment $ 100% Contract Price, $ Per unit 175,000.00 Est.

Bid Opening Date 11-22-60

To whom given? (Obligee.) Give full name and business address. If to a corporation, give exact corporate title City of Idaho Falls, Idaho Falls, Idaho Nature of Contract (give explanatory details) West Side Sewer System, Sewer mains and service lines."

 The instrument did not contain any other language which would identify any one specific bond as being applied for. Since said application was not on its face clear as to just which bond or bonds were being applied for, the court was justified in considering it to be ambiguous in that respect. The court after considering all of the evidence, including the custom in the area as represented by appellant's agents and established by other evidence, found:

"That under the application for contract bond, it is intended by the parties that the bid bond be issued only as a preliminary to the issuance of a performance bond, and it is intended under the terms of the application that the appraisal of the applicant as a risk sufficient for the plaintiff to issue all three aspects of the contract bond is to be completed prior to the issuance of the bid bond."

It is well settled that a contract includes not only what is stated expressly but also that which of necessity is implied from its language. Arch Sellery, Inc. v. Simpson, supra; Stusser v. Gottstein, 178 Wash. 360, 35 P.2d 5; Severson v. Barstow, 103 Mont. 526, 63 P.2d 1022.

 The general function of usage and custom is definition, explanation, elucidation. In the instant case the custom was not invoked to make a contract between the parties or to contradict any contract that had been made. It was only for the purpose of determining what the contract really was and not to overthrow it.

Appellant contends that "the court erred in finding the agent of Commercial, Kenneth K. Dehnert, had apparent authority to make representations to a bond purchaser * * *." The only finding of fact made by the trial court wherein the apparent au-

thority of said agent was mentioned are the following quoted paragraphs:

"XIV

" * * * I find that on November 21st, 1960, immediately prior to the execution by the defendant, Hartwell Excavating Co., Inc., of the aforesaid bid bond and in response to direct inquiry on the subject by said defendant, the plaintiff, by and through its agent, Kenneth K. Dehnert, acting within the scope of his apparent authority, orally represented to the defendant that it was the custom of the plaintiff that if the plaintiff issued a bid bond it would also provide a performance bond for the construction in question if the defendant, Hartwell Excavating Co., Inc., was the successful bidder.

\* · \* \* \* \* \*

"XVIII.

"I further find that both the plaintiff and the defendant performed this transaction with the knowledge of said custom and usage in that the plaintiff, by and through its agent, Kenneth K. Dehnert, acting within the scope of his apparent authority brought to the attention of the defendant, Hartwell Excavating Co., Inc., the aforementioned custom immediately prior to the signing of the bid bond by the defendant's President."

It clearly appears from the foregoing quoted findings that the representations made by the agent concerned only the "custom of the plaintiff [appellant]." The court did not find that the agent made representations as to his authority to act for appellant in any particular capacity or that the agent made any unauthorized commitment on behalf of appellant. The finding merely refers to a statement or representation by the agent to respondent regarding a custom which had been followed by appellant.

It is pertinent to this claimed error that we quote another finding of the court relating to the custom of bonding companies in the area involved:

"XVII.

" * * * I find that the custom and usage pertaining to such contract bonds in the Idaho Falls area was that if a bonding company wrote a bid bond for a public works construction it would also write the performance bond for such construction if the party for whom it had written the bid bond was the successful bidder, provided the successful bidder requested the writing of said performance bond."

We have hereinbefore stated that this finding is adequately supported by competent evidence. Our attention has not been called to evidence in this case which can

be considered as establishing that a different custom or practice was followed by appellant in said area. Although appellant's state agent and also its resident agent in Idaho Falls denied that there was a custom in the area, they each testified that they did not know of a single situation in the State of Idaho when appellant company has written a bid bond and has failed to issue a performance bond to the successful bidder. Since appellant had not followed any other practice we are unable to determine wherein the statement of the agent was incorrect.

Appellant contends that the court erred in concluding appellant was estopped to deny "apparent authority" of its agent. We adhere to the decisions of this court regarding the proof required to establish a grant of power exercised by an agent and binding upon his principal to third parties, a number of which are cited by appellant. However, we are here dealing with the doctrine of apparent authority and estoppel. A comprehensive statement of the similarity of these doctrines is stated in 3 Am.Jur. 2d, Agency, § 76, p. 479, as follows:

"Although the general statements of the doctrine of apparent authority do not include all the elements of an estoppel in pais, or equitable estoppel, the prerequisites for the application of the doctrine to bind the principal are such that there is no practical difference in effect between them in such respect; and, as applied by the courts, the doctrine of apparent authority is neither broader than nor essentially dissimilar to the estoppel of the principal to deny the agent's authority. Stated in terms of estoppel, the rule is that where a principal has, by his voluntary act, placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he was apparently clothed. This rule has been based upon the principle that where one of two innocent parties must suffer from the wrongful act of another, the loss should fall upon the one who, by his conduct, created the circumstances which enabled the third party to perpetrate the wrong and cause the loss." This general rule has been recognized by this court and in Texas Co. v. Peacock, 77 Idaho 408, 293 P.2d 949, it is stated:

"Respondents seek to invoke the rule that where a third party has changed

his position and thereby acted to his detriment by reason of reliance upon an agent's exercise of apparent authority, the principal is estopped as against the third party from denying the agent's authority. The rule is well known and should be applied for the protection of third parties who do not know the extent of the agent's real authority."

There is no question but that respondent in reliance upon such authority changed its position to its detriment and in this regard the court found:

"That by so executing the said bid bond and submitting said bond and bid to the City of Idaho Falls, the defendant changed its position to its prejudice in that by virtue of such action it was obligated under the terms of the application for contract bond to the extent that if the plaintiff made payment to the obligee named in said bond pursuant to the terms of the bid bond, then said defendant would be obligated to indemnify the plaintiff to the extent of such payment by the plaintiff."

In said Texas Co. case, supra, this court also stated:

"Where an agent has acted within the apparent scope of his authority and the third party dealing with the agent has relied upon the appearance of authority to such party's detriment, then in theory the principal becomes estopped to deny the agent's apparent authority to do the particular act or acts in controversy. Hammitt v. Virginia Mining Co., 32 Idaho 245, 181 P. 336; Madill v. Spokane Cattle Loan Co., 39 Idaho 754, 230 P. 45; Stout v. McNary, 75 Idaho 99, 267 P.2d 625."

We deem it proper to call attention to some of the evidence which supports the court's statement that the agent was acting within the scope of his apparent authority. Appellant acknowledges that upon securing departmental approval the agent Dehnert had the authority to sign contract bonds, such as are here involved, on behalf of appellant; applicant is not informed as to when or how such approval is procured; the agent tells the applicant what he must do and what he must furnish in order to obtain a bond from appellant; the agent notifies the applicant whether the bond applied for will be issued; the agent signs such bond as appellant's attorney in fact; normally no communication is sent directly by appellant to the applicant relative to the authorization for the writing of a bid or performance bond; the company authorizes its agent to advise the contractor whether he has authority to write the bond and in fact it is a general policy of appellant to handle all such matters through its local agent or attorney in fact. Although plaintiff's Exhibit 1, which is entitled "Underwriting Letter of Authority accompany-

ing Power of Attorney" relating to Mr. Dehnert's agency and appointment as attorney in fact, discloses that construction contract bonds must be submitted to the supervising office, it is admitted by Dehnert that such instrument is not filed as a public document nor did the agent ever show it to Mr. Hartwell.

The rule has been repeatedly stated by this court that where an agent has acted within the apparent scope of his authority and the third party dealing with the agent has relied upon the appearance of authority to such party's detriment, in theory the principal becomes estopped to deny agent's apparent authority to do the particular act or acts in controversy. White v. Doney, 82 Idaho 217, 351 P.2d 380; Manley v. MacFarland, 80 Idaho 312, 327 P.2d 758; Texas Company v. Peacock, 77 Idaho 408, 293 P.2d 949; Stout v. McNary, 75 Idaho 99, 267 P.2d 625; Madill v. Spokane Cattle Loan Co., 39 Idaho 754, 230 P. 45. The authority of the agent to act for and on behalf of his principal does not have to be established by direct or positive proof, but may be inferred from dealings, circumstances, acts and conduct. Stout v. McNary, supra; Carron v. Guido, 54 Idaho 494, 33 P.2d 345; Lightner v. Russell & Pugh Lumber Co., 52 Idaho 616, 17 P.2d 349.

The evidence in the instant case sustains the court's finding and conclusion that Dehnert was acting within the scope of his apparent authority when he represented to and promised respondent that the appellant was obligated to and would provide the performance bond if the respondent was the successful bidder, and that appellant is estopped to deny such authority.

We have examined the other contentions discussed in appellant's brief and do not find any reversible error. Having decided that the trial court's finding and conclusion that appellant is estopped to deny its agent's authority to obligate it to provide the performance bond and that appellant breached its obligation to do so are sustained by the record, the judgment is affirmed.

Costs to respondent.

McQUADE, C. J., and TAYLOR, J., concur.

McFADDEN, Justice (dissenting).

There are certain facets of this cause which lead me to the conclusion that the trial court was in error in entering judgment for the respondent.

Mr. Hartwell, respondent's president, testified unequivocally that he knew that Dehnert, the appellant's agent, had only limited authority insofar as the execution of the bond as applied for was concerned. It will be recalled that Mr. Hartwell testified as follows:

"Q. At the time you furnished that [the application] to Mr. Dehnert, was

there any discussion as to what would be done with this application?

A. It would just be submitted to a company and then they in turn would tell us the limits that they would bond.

Q. I see. And was there a discussion at that time and place as to whether or not Dr. Dehnert would give the approval on bonding?

A. Well, I don't know whether there was a discussion at that time whether Mr. Dehnert could issue a bond, but he—I knew that he had to have authority from his company to issue bid bond, yes.

Q. I see. And you had discussed that with him?

A. Well, prior to the bid opening, yes. I can't say just exactly the date, but we had discussed the fact that he had to submit this information to his company before they would authorize him to write this bid bond."

The testimony of Mr. Hartwell as to what Mr. Dehnert told him as to whether the appellant bonding company would issue the performance bond after issuance of the bid bond, is as follows:

"Q. Now would you relate, in detail, every word, as you recall, that was said by Mr. Dehnert and yourself at this time and place.

\*　　\*　　\*　　\*　　\*　　\*

A. Mr. Dehnert came to the office to bring the bid bond over for my signature, to accompany our bid. At the same time he brought this application for Commercial Insurance Company, which I have signed, and at the same time—this all took place in a matter of just a few minutes, because the time was getting short in submitting the bid—I asked Mr. Dehnert, at the time that I signed the bid and this application, if his company would give me a performance bond if I was successful as low bidder. He said, 'They have got to.'

Q. Are these the exact words of Mr. Dehnert, as you recall them?

A. As I recall, that's his exact words, 'They've got to.' "

It is thus undisputed that Mr. Hartwell knew that Mr. Dehnert did not have any authority to execute the bond or any bond without the prior approval of the appellant bonding company; yet Hartwell claims that even knowing of such limited authority he was entitled to rely on statements made by this same agent as to the appellant's obligation. The trial court concluded that Dehnert was within the scope of his apparent authority when he represented to and promised Hartwell that his company was obligated to and would provide the performance bond for the respondent, and that hence

the appellant is estopped to deny such apparent authority.

"In so far as a third person has notice or knowledge at the time of dealing with an agent of the inconsistency between the powers which the agent has and those which he assumes to exercise, the authority of the agent is deemed not to extend beyond that actually conferred upon him, to the exclusion of whatever apparent authority might exist in the absence of such notice or knowledge." 2 C.J.S. Agency § 92, p. 1188.

In Texas Company v. Peacock, 77 Idaho 408, 293 P.2d 949, this court stated:

"Under the circumstances shown herein, with the limitations of the agency of appellant's representatives known to respondents, the respondents could not acquire rights against appellant contrary to those known limitations. (Citing cases)."

In 3 Am.Jur.2d, p. 481, Agency § 77, it is stated:

"It is always competent for a principal to limit the authority of his agent, and if such limitations have been brought to the attention of the party with whom the agent is dealing, the power to bind the principal is defined thereby. Accordingly, the general rule is that one who deals with an agent, knowing that he is clothed with a limited or circumscribed authority and that his act transcends his powers, cannot hold his principal."

Restatement of the law. Agency 2d, § 166, states:

"A person with notice of a limitation of an agent's authority cannot subject the principal to liability upon a transaction with the agent if he should know that the agent is acting improperly."

See also: Hartford Fire Ins. Co., v. McAvoy, 177 Okl. 60, 57 P.2d 242, (1935); Travelers Indemnity Co. v. Collier, 205 Okl. 247, 237 P.2d 153 (1951); American Surety v. Lind, 132 Wash. 326, 232 P. 280, (1925); Cox v. Pabst Brewing Co., 128 F. 2d 468, (CA 10th); McComb v. Quaker Oats Co., 187 F.2d 422 (CA 5th).

It is my conclusion that the trial court was in error in relying upon any apparent authority on the part of Dehnert as the basis for discharging the defendant from its liability to reimburse the appellant for payments made. The statement attributed to Dehnert, that if after the bid bond was issued, his principal had to issue the performance and payment bond, would be beyond his authority. At most it is only an agent's opinion what the principal would do in the future, and is not a statement of an existing fact. See 19 Am.Jur. 656, Estoppel § 52; Annot: 115 A.L.R. 152; 48 A.L.R.2d 1069.

The trial court in its conclusions of law stated:

"That the application for contract bond constituted an application for contract bond with said contract bond to include all the bonding requirements for the West Side Sewer System Project including a bid bond, and in the event of a successful bid, a performance bond and ultimately, if necessary, a payment bond, and that when said applications were accepted by the plaintiff a binding contract was formed whereby the plaintiff was obligated to provide, in the event of a successful bid, a performance bond, and ultimately, if necessary a payment bond. * * *"

Such a conclusion is predicated on the proposition that there was only a single application or offer submitted by the respondent to encompass all the bonds. The application was entitled: "Application for Contract Bond", and it consisted of a number of blanks to be filled in by the applicant, together with a number of specific provisions. The respondent among other items, submitted the following data:

"Amount of Bond. Bid $ 5% Performance $100% Payment $100%
Contract Price, $ per unit 175,000.00 Est. Bid Opening
Date 11-22-1960.
 If contract price is per unit of measure, so state and give probable total of Contract.
To Whom Given? (Obligee.) Give full name and business address. * * *
 City of Idaho Falls, Idaho Falls, Idaho
Nature of Contract (give explanatory detains) West Side Sewer
System. Sewer Mains and service lines."

---

The application also contained as one of its provisions the following:

"16. That the company reserves the right to decline to issue the bond for which application is hereby made, and that no claim may be made against the Company in consequence of its failure to execute such bond; nor shall any claim be made in case the bond executed is not accepted by or on behalf of the obligee."

The application was an offer by the respondent to have the appellant issue the surety bond sought. Until this offer was accepted by appellant, there could be no liability between it and respondent. As in the case of insurance contracts, no liability arises until the offer has been accepted by the surety. See: 12 Insurance Law and

Practice, Appleman, 155 § 7121. This application was submitted for one specific job being bid by respondent. No one contemplated that upon acceptance of the offer all three of the bonds should immediately have been written. Otherwise, the respondent would have insisted upon the performance bond and payment bond at the same time that the bid bond was written. Only by considering this to be an instrument containing more than one offer does its various provisions become meaningful. Initially it was an offer by the respondent for appellant to issue its surety bond to the city, assuring the validity of respondent's bid. If respondent's bid for the sewer contract was accepted by the city, then the second offer would become effective, i. e., the application then became an offer for the performance bond, and ultimately the payment bond.

The specific terms of the application (Sec. 16) emphasizes this construction to be placed upon this application, for it is provided that the appellant reserved "the right to decline to issue the bond for which application was made."

Dealing with comparable situations, it is stated in 1 Corbin on Contracts, 225 § 53, as follows:

"There is one sort of case in which the offer is not made irrevocable either by a part performance or by an express notice of acceptance. This is the case in which an offer has been made in such terms as to create a power to make a series of separate contracts by a series of separate acceptances. The closing of one of these separate contracts by one acceptance leaves the offer still revocable as to any subsequent acceptance."

Restatement of Law of Contracts, § 44, provides:

"A revocable offer contemplating a series of independent contracts by separate acceptances may be effectively revoked so as to terminate the power to create future contracts, though one or more of the proposed contracts have already been formed by the offeree's acceptance."

1 Williston on Contracts, 3rd Ed. states: p. 183 § 58:

"Most offers contemplate a single acceptance by the offeree by an indivisible act or by an indivisible promise or set of promises. It is possible, however, to make a divisible offer requesting a series of acts or promises to be given from time to time, and agreeing in return to give a series of performances each of which is to be set off against a corresponding act or promise of the offeree. If an offer is of this divisible character it may be revoked not only before any acceptance but also as to any portion of the offer still

unaccepted even after acceptance of some of the series of transactions proposed by the offer."

It is my conclusion that the trial court was in error in determining that acceptance by the appellant of the application to issue the bid bond, bound appellant then to issue the performance and payment bonds upon respondent's bid being accepted by the city. And this is so, even if we accept as correct the finding by the trial court that there was a custom and usage "that if a bonding company wrote a bid bond for a public work construction it would also write the performance bond for such construction if the party for which it had written the bid bond was the successful bidder."

As concerns custom and usage, this court has repeatedly held that custom and usage cannot be used to vary or contradict the terms of a contract which is plain and unambiguous. Puget Sound Nat. Bank v. C. B. Lauch Const. Co., 73 Idaho 68, 245 P.2d 800; Gramkow v. Farmers Cooperative Irr. Co., 47 Idaho 578, 277 P. 431; Ehlinger v. Washburn-Wilson Seed Co., 51 Idaho 17, 1 P.2d 188. If the respondent's contention concerning custom and usage were correct, the express provisions of the application to the effect that the appellant reserved the right to decline to issue the bond, would be abrogated and made meaningless, which is beyond the function of use and custom. Branom v. Smith Frozen Foods of Idaho, Inc., 83 Idaho 502, 365 P.2d 958; Rest. of Law of Contracts § 246.

Finally it is my conclusion that the trial court was in error in its conclusions of law and that the payment by the plaintiff to the City of Idaho Falls in the amount of the bid bond was made voluntarily. This payment, in the face amount of the bond was made only after demand had been made to respondent to pay the amount of the bond. This demand was signed by the Mayor of the City of Idaho Falls, and a copy of the demand, with covering letter was forwarded to appellant by the city attorney. Exception to this procedure was taken by the respondent, which asserts that there were no minutes of such authority being granted by the city to the mayor or city attorney. Nonetheless, the city accepted the money paid by appellant. It is significant to note, however, that there is no contention that the mayor and city attorney were not in fact so authorized. If there was no authorization for them to make such demand, that would have become a matter of proof to be established by the respondent. Acceptance by the city council of the amount of the payment constituted a ratification of the acts of the mayor and city attorney, if they were in fact unauthorized. Thus, the conclusion reached by the trial court was in error.

The respective parties stipulated that in the event the court concludes the appellant

was entitled to an attorney's fee, the court should fix the amount thereof. The issue as to attorney's fee was not considered by the court.

The trial court erred in its evaluation of the law applicable to the defenses presented by respondent. The allegations of appellant's complaint were sustained by the evidence.

The judgment in this cause should be reversed and the cause remanded for entry of new conclusions of law in conformity with the views expressed herein and for entry of judgment in favor of the appellant, with the trial court to determine what, if any, attorney's fee should be awarded.

SMITH, J., concurs in this dissent.