977 P.2d 234

Terry **TENTINGER**, Kari Tentinger, Thomas G. Maile IV., dba New Horizon Construction, Plaintiffs–Respondents,

v.

Steven McPHETERS dba McPheters Builders, Defendant–Appellant.

and

All Unknown Individuals who claim an interest in the real property subject to these proceedings, individually, jointly and severally, Defendants.

No. 24676.

Court of Appeals of Idaho.

Feb. 25, 1999.

Review Denied May 18, 1999.

Steven L. McPheters pro se appellant.

Thomas G. Maile IV, Eagle, for respondent.

SCHWARTZMAN, Judge.

Steven McPheters appeals from the district court's affirmance of the magistrate's judgment and order awarding Terry Tentinger $420.00 for painting services performed at the request of McPheters, together with attorney fees and costs. For the reasons stated below, we affirm.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In the fall of 1995, Steven McPheters, a home builder and developer, obtained a bid from Terry Tentinger, dba New Horizon Construction, to do some touch-up and re-painting on one of his "spec" homes.[1] Tentinger submitted a bid of $690.00, but the parties subsequently negotiated a per hour fee. On Tentinger's second and final day on the job, McPheters testified that he spoke with Tentinger about some overspray on the home's upper deck. McPheters averred that Tentinger informed him that there was not enough paint overspray on the upper deck to make a difference. McPheters testified that he did not address the issue any further with

Tentinger. Tentinger, on the other hand, testified that McPheters never questioned the quality of the work or requested any touch-ups.

Thereafter, Tentinger billed McPheters $420 for the job, which represented fourteen hours of work at a $30 per hour rate. Jim McPheters, Steven McPheters's son, objected to the number of hours Tentinger billed, but did not express dissatisfaction with the work performed. Subsequently McPheters offered Tentinger $250 in satisfaction of the debt, but Tentinger refused. Tentinger then filed a mechanic's lien on McPheters's home and a complaint seeking enforcement of the lien, plus attorney fees. McPheters filed an answer and counterclaim, alleging that Tentinger's failure to perform the job in a workmanlike manner resulted in $2,500 in damages and that it would cost $500 to repair the damages caused by Tentinger's failure to properly perform. McPheters also counterclaimed for costs and attorney fees.

A bench trial was held February 9–10, 1997. The court heard testimony from, among others, Tentinger, Steven and Jim McPheters and individuals who had prior business dealings with both parties. A number of witnesses testified that it was standard practice for a builder to provide subcontractors who perform services with a "punch list" of touch-up or follow-up work needed to complete the job. Jim McPheters testified that he never informed Tentinger or anyone in his office regarding the dissatisfaction Steven McPheters felt with respect to Tentinger's paint job on the home. Jim McPheters further testified that "it's not common for us to give painters punch lists."

At the close of the evidence, the magistrate resolved the conflicting testimony in Tentinger's favor and concluded that there was a contract between the parties, and that despite some minor defects, Tentinger had substantially performed the painting job and McPheters had waived any defects in workmanship by failing to request that Tentinger cure such defects. The court also recognized and validated the mechanic's lien filed by

---

1. McPheters argues that the home was in fact his own personal home rather than a "spec" home. However, there is nothing in the record to indicate that McPheters relayed this information to Tentinger.

Tentinger to the extent of $420. Finally, the court awarded Tentinger $4,000 in attorney fees and $900.02 in costs.

Thereafter, McPheters filed an appeal to the district court. The district court heard oral argument and affirmed the magistrate's findings of fact and conclusions of law. The district court also awarded Tentinger attorney fees on appeal in the amount of $2,873.75. McPheters appeals again, arguing that the trial court erred in concluding that Tentinger substantially performed the contract and that he waived any defects in the workmanship by failing to provide Tentinger with a "punch list" of defects.

## II.

### STANDARD OF REVIEW

When an action is tried to a court sitting without a jury, this Court's review is limited to ascertaining whether the evidence supports the lower court's findings of fact, and whether these findings support the court's conclusions of law. I.R.C.P. 52(a); *J.P. Stravens Planning Assoc., Inc., v. City of Wallace,* 129 Idaho 542, 544, 928 P.2d 46, 48 (Ct.App.1996). This Court liberally construes the trial court's findings of fact in favor of the judgment entered and will not disturb findings which are supported by substantial, albeit conflicting, evidence. *Sun Valley Shamrock v. Travelers Leasing,* 118 Idaho 116, 118, 794 P.2d 1389, 1391 (1990). Witness credibility and the weight to be given evidence are within the trial court's province and will not be set aside unless clearly erroneous. *Id.*

## III.

### ANALYSIS

**A. The Trial Court Correctly Concluded That Tentinger Substantially Performed His Contract With McPheters**

McPheters argues that the evidence does not support the trial court's conclusion that Tentinger substantially performed the contract. McPheters specifically asserts that the following defects in Tentinger's workmanship preclude a finding of substantial

performance: (1) paint overspray underneath the redwood decking; (2) lack of paint coverage on portions of the rain gutter and downspout; and (3) water erosion caused by one of Tentinger's workers leaving a water hose turned on for an excessive period of time. McPheters argues that because it will cost him more to remedy these defects than Tentinger charged for the original job, Tentinger's work was commercially unreasonable and constitutes a material breach which excuses his own performance, i.e., the payment of Tentinger's bill.

A breach of contract is material or substantial if it "touches the fundamental purpose of the contract and defeats the object of the parties in entering into the contract." *Ervin Constr. Co. v. Van Orden,* 125 Idaho 695, 699, 874 P.2d 506, 510 (1993), *citing Enterprise, Inc. v. Nampa City,* 96 Idaho 734, 740, 536 P.2d 729, 735 (1975). Rescission is not available where the breach is merely incidental or subordinate to the main purpose of the contract and substantial performance has been rendered. *Id.* at 700, 874 P.2d at 511. "Substantial performance is performance which, despite a deviation from contract requirements, provides the important and essential benefits of the contract to the promisee." *J.P. Stravens,* 129 Idaho at 545, 928 P.2d at 49. The materiality of a breach is a factual question. *Ervin Constr. Co.,* 125 Idaho at 700, 874 P.2d at 511.

According to testimony presented at trial, the fundamental purpose of the contract was to provide touch-up painting work on McPheters's "spec" home so that he could place it on the market for sale. The trial court found that although his workmanship was not completely free of defects, Tentinger had substantially performed his obligation pursuant to the contract and was willing to return to McPheters's home to remedy any defects in his workmanship at no cost. This finding is supported by substantial and competent evidence, including witness testimony that although some touch-up work needed to be completed on the McPheters home, the job had been performed in a workmanlike manner. The court also had the opportunity to independently assess the quality of Tentinger's work through photographs of the

home submitted by McPheters. Although McPheters presented testimony indicating that Tentinger's workmanship was so defective as to render it commercially unreasonable, it was within the province of the trial court to resolve conflicting testimony and make credibility determinations. In light of the evidence and testimony presented, the trial court's conclusion that the contract had been substantially performed and McPheters had secured the essential benefits thereof is supported by substantial and competent evidence and is not clearly erroneous.

We note that McPheters also challenges the hourly rate charged by Tentinger, asserting that the agreed upon rate was $10 per man hour rather than $30 per man hour. However, a number of witnesses testified regarding the standard hourly rate for painters, and their testimony reflects a substantially higher per hour rate than that alleged by McPheters. In addition, the trial court explicitly found McPheters's assertion regarding the agreed upon hourly rate to be non-credible: "It just isn't believable that he thought he could have gotten a three man crew for $30." We conclude that the court's finding regarding the agreed upon hourly rate of pay is also supported by substantial and competent evidence.

**B. The Trial Court Properly Concluded That McPheters's Failure To Inform Tentinger Of Any Minor Defects In Workmanship Constituted A Waiver Of Such Defects**

McPheters argues that his failure to provide Tentinger with a "punch list" of defects in workmanship did not constitute a waiver of those defects and the trial court erred in so finding. McPheters specifically claims that such a "punch list" is not customary and he should not be held to a "nonexistent custom and practice of the building industry."

McPheters testified at trial that he brought up the issue of the overspray with Tentinger but that Tentinger said "there's not enough—enough paint on there to make any difference anyway." McPheters testified that following this comment, he did not complain further to Tentinger regarding defects in workmanship because "[a]nybody that would make a statement like that, when you can see that overspray, forget it, the conversation's over." McPheters also testified that he did not ask Tentinger to return to remedy the defects because he had "brought up the [quality of the] work and he says, 'Oh, well there's nothing wrong with it.' He went in my garage and pilfered around in that." The only subsequent discussions between the parties, according to McPheters, involved McPheters asking Tentinger how much he owed him for the work performed and a conversation where McPheters testified that he offered Tentinger $250 in satisfaction of his bill and informed Tentinger that he would fix the job himself.[2] McPheters asserted that he did not make any further attempt to identify other defects in Tentinger's workmanship or provide him with an opportunity to remedy the defects. Tentinger denied that McPheters ever complained about overspray or otherwise questioned the quality of his work.

A number of witnesses testified at trial that it is typical when painters deal with builders or other contractors for the builder or contractor to provide the painter with a list of problems with the paint job, if any, before rendering payment. The "custom and practice of a trade become part of a contract between parties within the trade having knowledge of the custom, unless the contrary appears." *Nordstrom v. Diamond Int'l Corp.*, 109 Idaho 718, 721, 710 P.2d 628, 631 (Ct.App.1985), *citing Commercial Ins. Co. v. Hartwell Excavating Co.*, 89 Idaho 531, 407 P.2d 312 (1965). Tentinger testified that he had been a painting contractor for three years, painting new residential construction, performing repaints, and a few commercial jobs. McPheters testified that he had been involved in the building industry, specifically as a home builder, for over twenty years. Tentinger called a number of witnesses who corroborated his assertion that it was standard practice for builders to provide painters

---

2. McPheters also testified that he did not believe Tentinger deserved any payment for his work but that he was willing to pay Tentinger to "get him out of my hair."

with "punch lists" of problem areas, thereby allowing the painter to cure the defect.

The trial court found the testimony of Tentinger and his witnesses to be more credible with respect to the custom and practice in the building industry. Although McPheters disputed the existence of such a custom in the industry, the trial court explicitly found his testimony to be non-credible. The court's finding that it was customary for builders to provide painters with the opportunity to cure problem areas or defects in workmanship, as between *these* parties, is not clearly erroneous and is supported by witness testimony.

Here, McPheters's failure to provide Tentinger with a punch list or to otherwise inform him of the defects in workmanship precluded Tentinger from remedying those defects. The trial court found that McPheters *intentionally* chose not to provide Tentinger with the opportunity to remedy the defects and that in so doing, McPheters waived his right to damages for counterclaims or set-offs. We agree. Under these circumstances, McPheters cannot now rely upon those defects in workmanship to abrogate or reduce his contractual obligation to pay for services which have been substantially performed by Tentinger. *See Steltz v. The Armory Co., Ltd.*, 15 Idaho 551, 555, 99 P. 98, 99 (1908) ("Had it been a patent and obvious defect or a failure to complete the building, the defendant would, under ordinary circumstances, be held to have waived the same by taking possession of the building without doing so conditionally or protesting against its condition or demanding its completion.").

### C. Tentinger Is Entitled To Costs And Attorney Fees On Appeal

 Tentinger requested attorney fees and costs pursuant to I.C. §§ 12–120, –121 and 45–615, which were granted by the magistrate court. Attorney fees are *mandatory* for actions to recover on a contract relating to the purchase of services or any commercial transaction pursuant to I.C. 12–120(3). Costs are also allowed as a matter of right pursuant to I.R.C.P. 54(d)(1). Therefore, the trial court did not err in awarding costs and attorney fees to Tentinger as the prevailing party.

So too, I.C. § 12–120(3) has been interpreted to authorize the award of attorney fees on appeal as well as at trial. *J.R. Simplot Co. v. Chemetics Int'l, Inc.*, 130 Idaho 255, 258, 939 P.2d 574, 577 (1997); *Farm Credit Bank of Spokane v. Stevenson*, 125 Idaho 270, 275, 869 P.2d 1365, 1370 (1994). When properly requested in the first appellate brief filed by a party, I.A.R. 41 provides for an award of attorney fees on appeal. In the instant case, Tentinger has again prevailed and also asserted a claim for attorney fees. Accordingly, we affirm the district court's award of attorney fees on the intermediate appeal and award attorney fees on this appeal.[3]

## IV.

## CONCLUSION

We affirm the magistrate's findings of fact, conclusion of law and judgment, and award Tentinger costs and attorney fees on appeal in accordance with I.A.R. 40 and 41.

Judge LANSING and Judge Pro Tem GUTIERREZ, CONCUR.

---

3. We feel constrained to note that it is indeed *unfortunate* that a $420 claim has so far engendered $6,873.75 in attorney fees, not including what we must also order. For future reference, a party would be better served to pay this type of bill under protest and then sue in small claims court for any disputed difference. That way attorney fees, which far *eclipse* the amount in controversy, could be avoided.